No. 2600.

## I. N. WILLIAMS v. THE STATE.

1. JAIL BREAKING TO RESCUE PRISONERS—INDICTMENT conforming to No. 138 of Willson's Criminal Forms is sufficient to charge the offense of breaking into a jail to rescue a prisoner, as that offense is defined by article 212 of the Penal Code.

2. PRACTICE—CHARGE OF THE COURT.—It is only when the error in the charge of the court is fundamental, or when, in view of all the facts in the case it was calculated to injure the rights of the defendant, that the charge, in the absence of a proper bill of exceptions or of a requested instruction, will be revised.

3. SAME.—The objection urged to the charge in this case was that it is fundamentally defective, in that it did not explain to the jury the meaning of the word "break" as used in the statute defining the offense of breaking into a jail to rescue a prisoner—the defense contending that the definition of that term as it is used in the statute defining burglary is insufficient as applied to the offense of jail breaking; and further, that the term as used in the latter statute, not being specifically defined, it must be construed in the sense in which it is ordinarily understood in common language. *Held,* that, the evidence showing that the appellant entered the lower room of the jail by unbolting an unlocked door, and that he then forced the jailer, at the point of a pistol, to unlock the prison cages, was sufficient to prove such a breaking as is contemplated by the statute. See the opinion in extenso on the question.

4. SAME—EVIDENCE.—See the opinion for evidence *held* to have been properly admitted under the rule that, a conspiracy having been established, the acts and declarations of one conspirator pending the conspiracy, and in furtherance of the criminal design, are admissible against all of the conspirators, and note the statement of the case for evidence *held* sufficient to support a conviction for breaking into a jail to rescue a prisoner.

APPEAL from the District Court of Comanche. Tried below before the Hon. T. H. Conner.

2

The indictment in this case, based upon article 212 of the Penal Code, charged the appellant with breaking into the jail of Comanche county, Texas, on the twenty-eighth day of March, 1886, for the purpose of rescuing one Henry Williams, a prisoner confined in the said jail. The trial resulted in the conviction of the appellant, and the penalty assessed against him was a term of four years in the penitentiary.

The State first introduced in evidence an indictment preferred against Henry F. Williams by the grand jury of Comanche county, charging him with the theft of a horse from E. B. Henderson, in December, 1885, the capias issued thereon and the sheriff's return of the same, dated February 6, 1886, showing the arrest of the said Henry F. Williams and his confinement in the Comanche county jail. The next evidence introduced by the State was the record of the trial of the said Henry F. Williams upon the said indictment at the February term, 1887, of the Comanche county district court, which showed his conviction under a verdict assessing his punishment at a term of fifteen years in the penitentiary. The State also read in evidence from the said record the judgment of the court based upon the said verdict.

R. A. Slack was the first witness for the State. He testified that on the twenty-eighth day of March, 1886, he was deputy sheriff and jailor of Comanche county, Texas, serving under the sheriff, James Cunningham. At the time mentioned the jail contained but three prisoners, viz: Henry Williams, recently convicted for horse theft and under a sentence of fifteen years in the penitentiary therefor; James Henry Hill, who had been recently convicted for horse theft and awarded a term of five years in the penitentiary, and Charley Atkinson, who had been convicted of cattle theft and awarded a term of ――― years in the penitentiary. The convictions in the Hill and Atkinson cases had, however, been set aside and new trials granted them. The Comanche county jail was a two story building. The witness and his family occupied the lower story as a residence. The cages in which the prisoners were kept were up stairs. A hallway traversed the lower story, and a corresponding one ran across the building in the upper story. The stairway stood about halfway in the hall. A wooden door divided the stairway about halfway up. Two heavy iron doors standing opposite each other, one of solid iron and one of iron grating, opened from the upper hall into the cages. An iron door led from the cages to

an outer apartment, or run around. An iron door then led from the run around into the cells proper. All of the said prisoners were, on the night of March 28, 1886, confined in the cells proper, and all of the doors leading thence into the upper hall were securely bolted and locked, and the witness had the keys. The door on the stairway and the doors leading from the lower hall into the outer world were all closed and bolted but were not locked. After eating his supper on the said night, the witness placed a light in his family room, near the door leading into the lower hall, closed and bolted the outside doors, and sat down outside of the jail. He remained there a short time and went over to the Presbyterian church, where a protracted meeting was in progress. The witness's family were not at the jail on that night. The witness remained at the protracted meeting an hour and a half or two hours, returning to the jail between nine and ten o'clock p. m. He found the door leading into the jail house, down stairs, closed and bolted, just as he left it. Witness entered, and just as he closed the said door, several parties, who had entered the lower apartments during his absence, covered him with guns and ordered him to go up stairs with them and open up the cells. Witness asked the parties what they meant. In reply they merely repeated the order for witness to go up stairs and open the cell doors, and witness obeyed them. Having opened all of the doors but that to the inner cell, the witness, for the purpose of getting a view of the faces of the men, complained that he could not see the key hole, and requested one of them to strike a match. One of them did so, but when the witness undertook to turn his head towards the parties, one of the men placed a pistol to his face and said: "You just keep your eyes on that lock." Witness then opened the door. When all the doors were thrown open, one of the men said to the prisoners: "Come out of there quick, fellows. Let's get away from here." The prisoners named came out of the cells, and all parties, rescued, rescuers and witness, left the jail. When the street was reached, Henry Williams seized one of witness's arms and one of the rescuers seized the other, and, preceded by some of the party and followed by others, they started with him towards the graveyard. When the thicket near the graveyard was reached, the party stopped. The prisoners and two of the rescuers remained in the thicket with witness, and the other rescuers went after their horses, which they appear to have secreted some where near. These parties soon returned with

horses. They then told Hill and Atkinson to take care of themselves, and they left, traveling on foot. The night was extremely dark and it was drizzling briskly. It was therefore utterly impossible for the witness to distinguish any one of the rescuing party. But when, in obedience to direction, Henry Williams mounted one of the horses, behind one of the men, the witness went up to him to shake hands, in order to get a look at the horse. While shaking hands with Henry he observed that the horse the latter had mounted was a roan in color. It was too dark for the witness to distinguish the brand or flesh marks of the horse. The witness saw that one of the other horses was a white or gray in color and the others were all dark animals.

Henry Williams and the witness having shaken hands and bid each other good bye, the rescuers and the said Henry Williams rode off in an easterly direction. They carried with them the witness's pistol, which they took from him when they first confronted him in the lower hall of the jail, and the witness has not seen it since. Five men composed the rescuing party. As soon as he was released the witness made his way back to the jail, hunted up Sheriff Cunningham and gave the alarm. Two pursuing parties were organized, the witness going with that headed by Sheriff Cunningham. The second party was composed of Burrell Taylor, Dudley Sherrill and Turner Breedlove. The witness's party did not strike the trail at all. On their way to the thicket, after securing the release of the prisoners, the rescuing party, with the witness in their charge, passed the church. Services had just closed, and witness saw a great many persons passing out of the church. The prisoner Hill was subsequently recaptured, retried and convicted, and is now in the penitentiary. Atkinson is still at large. The jail was not entered by the rescuers with the consent or connivance of the witness. He opened the jail doors for them, at the point of their pistols, because he was afraid not to do so.

J. D. Sherrell was the next witness for the State. He testified, in substance, that he lived in the town of Comanche, Comanche county, Texas, on the night of March 28, 1886, when the Comanche county jail was forced, and Henry Williams and other prisoners were released. The witness, Burrell Taylor and Turner Breedlove, as a sheriff's posse, left Comanche at about eleven o'clock on that night in pursuit of the rescuing party. Proceeding upon information obtained in answer to inquiries, the witness's posse traveled over the road running west from Comanche

and known as the Comanche and Callahan or Belle Plain road. They struck the trail of a two horse buggy and three horsemen and followed it that night until they reached the house of the widow Garrett, about fifteen miles from Comanche. They remained at Mrs. Garrett's until morning, when they resumed the pursuit, following the plain trail of the buggy and horsemen. The trail pointing to May's store, the party took the road leading to May's store from the road they had been traveling, expecting to overtake the rescuers at said store or to obtain definite information. Failing to hear of the parties at May's store, they returned to the Comanche and Callahan road, across country, and struck it near Suddeth's residence, about two miles from where they left it to go to May's store. Here they again found the trail. At that point the Cisco and Brownwood road intersected the Callahan and Comanche road, and followed it for a short distance. The trail of the buggy from Suddeth's on was plainer than it was from Suddeth's to Garrett's. A rain had fallen during the early part of the previous night and water was still standing in the ruts between Garrett's and Suddeth's made by the buggy wheels. There being no water in the ruts beyond Suddeth's, it was evident that the buggy had passed over that part of the road subsequent to the rain. The posse encountered no difficulty in following the trail until they reached the point where the buggy and the horsemen finally separated. The buggy, in the main, traveled the main road, but occasionally left it, traveling through gullies, broken country and steep banks or hills. At the point of final separation, the buggy turned from the road to the left at or near the house of a man named Ford. The trail of the horsemen followed Ford's fence, and at another place went over rough country from the road, by the place of a man named Spence, whence it followed a dim path back to the main road, two miles further on, near Coffelt's place. The buggy track, leaving the main road, went to the Old Fort ranch, about thirty-five miles distant from Comanche. At the Old Fort ranch the witness's posse found George Dennis and John Williams, two of the parties charged in separate indictments with complicity in this offense. At the same place they found the buggy and the two horses. The buggy was standing near the ranch building. The two horses were found in an old outhouse near by. The harness was piled on the gallery of the ranch house.

When the witness and the members of his posse entered the

ɹnch house they found Dennis and John Williams sitting over a smouldering fire. ˙ They were immediately arrested. Among their effects some blankets and two pistols, one a white and the other a brown handled weapon, were found. No one was then living at the Old Fort ranch. Dennis and John Williams said that they had just eaten their dinner. The Old Fort ranch was in full view of the public road, and could be seen for at least a quarter of a mile. Having arrested Dennis and John Williams, the witness and his party hitched up the buggy, an old no top vehicle, and started back with their prisoners. One of the horses found in the possession of Dennis and John Williams was a blue roan and the other a sorrel animal. The witness had since seen the buggy and horses in Huse's wagon yard, in the town of Comanche. Witness did not examine the brands on the horses. The prisoners were taken to Coffelt's house, where a party was secured to aid Mr. Breedlove in taking them to the Comanche jail, and then witness and Taylor resumed their pursuit of the horsemen.

Witness and Taylor soon struck the trail, which led off towards Bird's store and the bayou. From the point where they struck the trail they followed it to an old unoccupied house in the valley, some distance off the main road. At the old house the trail turned back in a northerly direction, traveling sometimes over the main road and sometimes over the rough country. At one place, about a mile and a half from the main road, the witness found where the horsemen had stopped to eat a meal. From that point the trail was followed to the Pecan bayou, which it crossed and recrossed several times. It left the bayou below Crosscut and traveled up a ravine or canyon. This route was remote from any road or traveled course, and was over an exceedingly broken and rough country. Over this course the trail was followed to and through the gate at Watley's place, whence it led off in a northerly direction, following no road. It went into the pasture of Charles McDermott, but not through a gate. The pasture was entered by two of the fence posts being uprooted and the wires bent down. It was now near dark, and the witness and Taylor went to Dunlap's house, near by, and remained over night. On the next morning they went into McDermott's pasture, in the manner that the three horsemen had entered it, took the trail and resumed the pursuit. They went directly to McDermott's house, which was in the pasture, and ascertained that the men they were following passed the pre-

vious night at that house. At McDermott's house they found McDermott, E. O. Woods and two or three others. Woods and two other parties then joined witness and Taylor and the pursuit was resumed. The horsemen went out of the pasture as they entered it, and went off in a northwesterly direction. From this point the trail led over a hard, solid turf, and was followed slowly and with great difficulty for about twelve miles, when the pursuit was abandoned.

Burrell Taylor testified, for the State, substantially as did the witness Sherrill.

Turner Breedlove testified, for the State, substantially as did Sherrill and Taylor, up to the point at which he left them at Coffelt's, to take the prisoners Dennis and John Williams to Comanche. From this point he testified, in substance, that, leaving Coffelt's, he took Dennis and John Williams to May's store, where he hired parties to guard them over night, while he slept. On the next morning he took the prisoners to Comanche and turned them over to the sheriff. He then placed the buggy and horses in Huse's wagon yard, where they remained until after the examining trial of the prisoners. The blue roan horse was branded XHX on the left hip. If he was otherwise branded the witness did not observe it. Witness saw but could not remember the brand on 'the sorrel horse.

S. N. Acton testified, for the State, that he lived in Comanche county, about four miles from the town of Comanche. The witness was out hunting his mules, at about an hour and a half by sun, on the evening of March 28, 1886, on the night of which day the jail delivery in Comanche occurred. While engaged in hunting his mules he came upon an old man and two young men, camped about five hundred yards from the road. The old man said that he and his party were from Bosque county, and were hunting a tract of eight hundred or nine hundred acres of land suitable for a stock ranch. The witness mentioned a tract of land he thought desirable for a stock ranch, and told the old man from whom he could purchase. In the defendant on trial the witness recognizes the old man described. The two young men with him the witness recognizes as George Dennis and John Williams, charged as parties to this offense and now in court. The witness was directly interested in the settlement of the country, and made it a point to observe closely all persons coming into the county, especially if they spoke of settling, and was certain that the defendant and Dennis and John Wil-

liams were the three men he saw in the camp as stated. They had an old no top, two horse buggy with them, out of the box of which two horses, one being a blue roan, were eating. He was not certain now, but it was his recollection that he saw several other horses about the camp. Witness observed the roan horse particularly, because he then thought that he had previously seen him both in Johnson and Dallas counties. After the arrest of these parties the witness went to the jail and identified defendant, Dennis and John Williams as the men he saw in the camp; and at Huse's wagon yard he pointed out the roan horse he saw in their possession. Witness saw more than one well rigged saddle in the camp, and as many if not more than four horses in and about the camp.

J. M. Zachery testified, for the State, that he lived on the Comanche and Callahan road, about three miles distant from Comanche. Five men, strangers to the witness, one riding a blue roan, another a gray or white and the others dark horses, passed the witness's house on Sunday, March 28, 1886, traveling slowly towards the town of Comanche. None of them passed nearer than one hundred and fifty yards of the witness, and he could identify none of them. One of them, as he sat in the saddle, was a head and shoulders taller than the others.

S. F. Hilley testified, for the State, that he lived about ten miles from the town of Comanche, on the Comanche and Callahan road. On the night of Saturday, March 27, 1886, the night before the jail delivery, five men passed witness's house, traveling leisurely towards Comanche. Two of the men first passed on horseback. They stopped at the gate and asked the way to De Leon. About an hour later an elderly man, riding in a two horse, no top buggy, and two men on horseback came along. One of these last horsemen was riding a blue roan horse. This party stopped at the gate and asked if they could procure feed for their horses. Witness's son James was then at the wood pile.

James Hilley testified, for the State, substantially as did his father, and in addition that he observed the roan horse closely, because the brand, XHX, resembled the brand of his uncle, which was XXI. On the next night the sheriff's posse came by the house and reported the jail delivery.

C. L. Gatcher testified, for the State, that about two or three hours by sun, on Monday, March 29, 1886, three men, two riding sorrel horses, stopped at his house, about thirty miles west from

Comanche, on the Comanche and Callahan road, and stayed about a half an hour to warm. The old man of the party said that he and his companions were land hunters from Bosque county; that they stopped over the preceding night a few miles back, and found it hard weather for land hunters. About three-quarters of an hour after the men left, Taylor, Sherrell and Breedlove arrived at witness's house, reported the jail delivery of the night before, and went on in pursuit of the men. The preceding night was a very cold one, a heavy rain and sleet having fallen.

L. H. Coffelt testified, for the State, that he lived about four miles from Gatcher, and on the same road. On Friday or Saturday preceding the jail breaking, an old man in a no top two horse buggy, and two men on horseback, passed witness's house going toward Comanche. They asked the distances to Clio, Seip Springs and Comanche.

J. H. Mattison testified, for the State, that he lived near the house of the witness Coffelt. About two hours after sunrise on Monday, March 29, 1886, two men riding in a no top two horse buggy came to his house and stopped to warm, the weather being very cold. They said they had come from near Clio, some ten or twelve miles south from witness's house and seven or eight miles south from May's store. They said that they lived in Taylor county. Soon after they left, officers Taylor, Sherrell and Breedlove passed, and in the course of the day returned, having the same two men and the two horse no top buggy in charge. The two men were George Dennis and John Williams, now in court and charged as parties to the jail delivery in Comanche. The Old Fort ranch, where they were said to have been arrested, was about four miles from witness's house. Mrs. J. H. Mattison corroborated the testimony of her husband.

H. Hollibee testified, for the State, that he lived in Brown county, about two and a half miles from the residence of the witness Mattison. Witness was at May's store, in Comanche county, on Saturday, the day before the jail delivery. On the road he saw five men going toward Comanche. Three, and it may be four, of the men were on horseback. An old man, and, witness thought, another man, were traveling in a no top two horse buggy. Another horse was being led or driven. They asked the distance to Comanche, and traveled on. Witness had known the defendant in this case for many years, first knowing him in Bosque county, when he was county treasurer. If de-

fendant was the old man he met in the buggy, witness did not recognize him.

W. S. Ford testified, for the State, that he lived on the Comanche and Callahan road, about twenty-five miles from Comanche. Between daylight and sun up, on Monday, March 29, 1886, three men riding horseback, one of the horses being gray, and two men in a no top two horse buggy, passed witness's house going west. The buggy did not go immediately by, but circled around witness's house, through the woods. Later on that day three officers passed witness's house in pursuit of parties who had delivered three prisoners from the Comanche county jail. In the evening the officers came back, having in charge the two men who passed the witness's house in the buggy.

E. O. Woods testified, for the State, that he spent the night of Monday, March 29, 1886, at McDermott's ranch, about fifty miles from Comanche. About sundown on that day three men, one riding a gray, one a sorrel, and the other a dark brown horse, came to McDermott's house and asked to stay over night. Two of their horses were in the "buckle brand." They gave no names nor did they say where they were going, but said they came from Brown county. Their horses appeared to have been ridden hard. The defendant on trial was the old man of the three who came to and stayed at McDermott's house on that night. The three men did not leave McDermott's house until rather late on Tuesday morning, and soon after they left, Taylor, Sherrell and another man, a Mr. Dunlap, arrived, asking for three men whom they had trailed to the house.

Sheriff Cunningham testified, for the State, that he saw the man, George Dennis, who was under indictment for this offense, in the town of Comanche, about three o'clock on Sunday evening, on the night of which day the jail breaking occurred. Dennis was walking about the jail and appeared to be examining it, and his actions were so strange that witness came near arresting him on suspicion. At a later hour witness saw him in company with another man at the livery stable where their horses were being fed. Witness had not since seen the other man. The jail was entered by some parties on that Sunday night without the knowledge or consent of the witness.

Fred. A. Beall, deputy sheriff of Nolan county, testified, for the State, that he arrested the defendant in Nolan county, Texas, upon process from Comanche county, the charge being that involved in this prosecution. The arrest was made near old man

Dennis's house, which the witness had watched for some time. When arrested, the defendant was sitting in a thicket of shinnery bushes, with a Winchester rifle across his lap. Witness arrested defendant by covering him with his gun. Henry Williams, who was released from the Comanche county jail, was a son of the defendant. John Williams, under indictment as one of the rescuers, was a nephew of the defendant, and George Dennis was the defendant's son-in-law. Defendant and Dennis lived in Nolan county in March, 1886, and John Williams then lived in Callahan county.

Steve Shelley testified, for the State, that in March, 1886, he lived in Callahan county, about one and a half miles distant from John Williams's house. He knew that John Williams left home late in March, 1886, and was gone some time.

Mat. Shelley and his wife testified, for the State, that they knew that John Williams and his uncle, this defendant, were at John Williams's house, in Nolan county, on Tuesday, the twenty-third day of March, 1886. They were not there on the following Saturday, but the wife of this defendant was there. Mat. Shelley stated also that he knew that John Williams owned, in March, 1886, a blue roan horse, branded XHX on the hip, and a sorrel horse whose brand he did not remember.

R. Y. Scott testified, for the State, that in March, 1886, John Williams owned a blue roan horse branded XHX on the left hip and JW on the left shoulder. He also owned a sorrel horse, but witness did not remember his brand.

J. C. Montgomery, a son-in-law of the defendant, was the next witness for the State. He testified that in March, 1886, the defendant owned a number of horses in what was known as the "buckle brand."

The State closed.

Turner Breedlove, recalled by the defense, testified that he was one of the Sherrell party which left Comanche about eleven o'clock at night, on Sunday, in pursuit of the jail breakers. The first the witness saw of a trail of a buggy or horseman was at the house of the widow Garrett, fifteen miles from Comanche. The trail at that point was not as fresh as it was at Suddeth's, one and a half miles from May's store.

J. C. Montgomery testified, for the defense, that he was at home in Nolan county on the twenty-eighth day of March, 1886, and on the following Monday, the twenty-ninth, and Tuesday, the thirtieth. It was his best recollection that he saw the de-

fendant at his home in Nolan county on Tuesday, but he would not be certain that it was not Wednesday. The distance from defendant's house in Nolan county to John Williams's house in Callahan county was fifty-six miles. Witness remembered the arrest of defendant by Deputy Sheriff Beall. He had been previously arrested by Sheriff Bardwell, but made his escape. Witness made a bond for George Dennis, in Nolan county, and sent it to the sheriff of Comanche county, who refused to accept it, although it was a first class bond. Witness did not tell defendant about the sheriff of Comanche refusing Dennis's bond until after the defendant made his escape from Bardwell. Witness saw the defendant in Nolan county previous to the jail breaking in Comanche. He said nothing to witness indicating his intention to break the jail. Witness knew that the defendant had received several letters from his son Henry, then in the Comanche jail, begging for help. Witness came to this trial from DeLeon with the district attorney, and remembered saying to that officer that it might have been Wednesday that he saw defendant in Nolan county, but that he thought it was Tuesday. Witness, who, in 1886, was worth eight thousand dollars, signed Dennis's bond. Tom Dennis, another signer, had about two hundred head of cattle. Everest, another signer, had about two hundred head of cattle and ten horses. Hugh Dennis, another signer, had about 400 head of cattle, some school land and about 45 head of horses.

Sheriff Cunningham testified, for the defense, that the Dennis bond, signed, as stated by the witness Montgomery, was refused by him, witness, although the sheriff of Nolan county wrote him that he thought the bond was good, and if returnable to his county would be accepted by him. Sweetwater, in Nolan county, was about one hundred miles from Comanche.

B. D. Shropshire testified, for the defense, that he represented Henry Williams as attorney on his trial for horse theft, and was under engagement to represent him on appeal. On Saturday, the day before the jail delivery, the witness received a letter from the defendant, postmarked at Sweetwater on Thursday or Friday. Witness knew that letter to be in defendant's handwriting, but could not say that the defendant personally placed it in the postoffice in Sweetwater.

The motion for a new trial raised the questions discussed in the opinion.

*Shropshire, Thurman & Jenkins,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.    Appellant has been tried and stands convicted under article 212 of the Penal Code, which provides that, "if any person shall break into any jail for the purpose of effecting the rescue or escape of a prisoner therein confined, or for the purpose of aiding in the escape of any prisoner so confined, he shall be punished by imprisonment in the penitentiary for a term not less than two nor more than six years."

The indictment upon which he was tried is in proper form and is sufficient. (Willson's Criminal Forms, No. 138, p. 77.)    Appellant asked no special instructions in addition to the charge of the court as given to the jury, but saved a general exception to the charge given, to wit, "that it did not charge the law in the cause."    No special defect is pointed out, but it is insisted in the brief of counsel that the charge is radically defective, notwithstanding it contained the statutory declaration of the crime in terms used above, because it omitted to explain to the jury the meaning and character of the word "break," as used in the statute.    It is insisted that the definition of the word "breaking;" in burglary, to wit, that the slightest force is sufficient, as by the lifting of a latch, etc. (Penal Code, art. 708), does not and can not be made to apply to this character of case, since no legal definition of the word "break" as here used is given, as is done in burglary, and that in such conditions the rule is that all words not specially defined are to be taken and construed in the sense in which they are understood in common language.    (Penal Code, art. 10.)    We think the unbolting of the door of the house by the parties in the first instance was sufficient, in contemplation of this statute, to constitute a breaking under the circumstances of the case.

If it be conceded, however, that the failure to define the meaning of the word "break" is erroneous, there being no special exception saved to it on the ground of such omission, and no proper instruction upon the subject requested by defendant and refused by the court, the exercise of the authority to revise the charge and reverse the case for such error depends upon the inquiry whether the error was fundamental or calculated to injure the rights of the defendant.    If found to be of that character,

the defendant is entitled to a new trial, though he neither excepted to the charge nor asked further instructions. (Henry v. The State, 9 Texas Ct. App., 59; Leache v. The State, 22 Texas Ct. App., 314, where all the authorities are collated; Cook v. The State, Id., 511.)

In this case it is contended that the evidence shows no such actual breaking into the jail as the word "break" is generally used and understood to mean in common language, because the entrance was effected through an unlocked door by simply turning a bolt, without any other violence to the house. Even if this were true, in so far as the first entry by the parties into the lower story of the house is proven, this lower story was not the apartment in which prisoners were confined. The cages and prisoners were up stairs. These parties, after getting into the lower hall by unbolting the door, waited until the jailer returned, and with threats of summary violence they forced him, at the muzzle of their pistols, to go up stairs and unlock the doors and cages for them. Such force was as illegal and as effectual as if they had crushed the doors in with battering rams. If, instead of forcing the jailor thus to open the door, any one of the parties had taken the key from him at the point of his pistol and then gone up stairs and unlocked the doors with it, can it for a moment be doubted but that, in common language, it would be said, and with truth, that such party broke into the jail? We think not. When the jailor did as they commanded, it was just as though they had done the act with their own hands. "Qui facit per alium facit per se," is a maxim applicable in criminal as well as civil law. (Doss v. The State, 21 Texas Ct. App., 505; 6 Crim. Law Mag., 350.) Viewed in the light of the facts proven, even if it be conceded that the charge of the court was erroneous in omitting to define the word "break," the error is not fundamental, and is simply error without prejudice, which, without special exception thereto, is always harmless.

Exceptions were reserved to the acts, sayings and movements of John Williams and George Dennis, two of the parties implicated in the jail breaking, before and subsequent to the commission of the crime, and when this defendant was not present. As exhibited in the record, we are of opinion the testimony was properly admitted. A conspiracy between the parties and defendant is, we think, clearly established by the circumstances, when considered all together. What was said and done before consummation of the common design by any one or more of the

conspirators, and in furtherance of it, was unquestionably admissible under well established rules. As to what was done in arresting and bringing back the two parties named, after the consummation of the act, and when defendant was not present, this was legitimate and admissible for the purpose of identifying all the parties connected with the crime.

There were five parties acting together. After releasing the prisoners they took them, with the jailor, out of town to a thicket, and there they got their horses and buggy and left with Henry Williams, whose rescue they were effecting, and turned the other prisoners and the jailor loose. It was night and so dark that the jailor could not see the parties, or any of them, so as to identify them, but, before they left, he went up to shake hands with the prisoner, Henry Williams, and found that the prisoner was mounted upon a roan horse, and he also saw a white or gray horse in the crowd. That night the sheriff with a posse started in pursuit, and striking a trail, they followed it for many miles until the fleeing parties separated and took different directions. The posse from this point followed one of the trails. They trailed the buggy, and followed it until they came upon John Williams and George Dennis at a deserted ranch, and one of the horses they had with them was a roan horse. They arrested and brought them back to town. As before stated, this evidence was legitimate as going to prove the identity of the parties who had committed the crime. There was no act or statement of the parties calculated in the slightest degree to injure the defendant permitted to be given in evidence. We see no error in the rulings of the court permitting the testimony in the first instance, and in refusing to strike it out in the second.

Objection was made to the testimony of Mrs. Neal Shelly, to the effect that a few days prior to the jail breaking the wife of John Williams told witness, at John Williams's house, that the defendant in this case, who was also there, was an uncle of John Williams, and that she heard John call him "Uncle Ike." If it be conceded that this testimony was hearsay, and consequently inadmissible, no injury could possibly accrue to defendant from it, because the witness Fred A. Beall, deputy sheriff of Nolan county, who knew the Williams family, testified that John Williams was a nephew of this defendant. Moreover, Mrs. Shelly identified the defendant as the party she had seen and been introduced to at John Williams's on the occasion referred to by her.

It is urgently insisted that the evidence in the case is insufficient to connect this defendant satisfactorily and conclusively with the crime committed. We do not think so. On the contrary, we think the evidence, though circumstantial, fully warrants the findings of the jury. We are of opinion appellant has had a fair trial, and, having found no error in the record requiring a reversal of the judgment, the same is affirmed.

*Affirmed.*