### PETE WILLIAMS v. THE STATE.

#### No. 2626. Decided June 23, 1903.

**1.—Misconduct of Jury.**

See opinion for several matters stated, held to be such misconduct of the jury as required a reversal of the judgment.

**2.—Conspiracy—Declarations of Parties.**

Declarations and statements of any of the parties to a conspiracy to commit crime are admissible in evidence against any of the coconspirators on trial, if made pending the conspiracy, or in the presence of the defendant now on trial.

**3.—Theft of Horses—Defendant's Explanation of His Possession.**

Defendant's declaration explanatory of his possession of stolen horses, made two or three days after his possession had been first questioned, in another county, were properly excluded.

**4.—Receiving Stolen Property—Evidence.**

On a trial for receiving a stolen horse, where the theory of the State was that a sale of the horse was a sham and fraud, a bill of sale and a note executed to cover up the fraudulent transaction was competent testimony to go to the jury for what it was worth.

Appeal from the District Court of Somervell. Tried below before Hon. W. J. Oxford.

Appeal from a conviction of receiving a stolen horse; penalty, two years imprisonment in the penitentiary.

The important facts of the case can be readily gathered from the opinion.

*Hiner & Wilson* and *J. E. Pearce,* for appellant, filed an able and elaborate argument.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was charged by indictment with theft, as well as receiving stolen property. The court submitted the case alone upon the counts for receiving, and the penalty assessed by the jury was two years confinement in the penitentiary.

Among other things, reversal is sought on account of the misconduct of the jury. In support of this is filed the affidavits of W. L. Stewart and B. L. Denio. Upon the trial of the motion, Sullivan testified that he was a juror who tried appellant; that after the retirement of the jury and while deliberating upon the case, some one stated that he would not believe the evidence of John Hankins. Hankins was the principal State's witness and a particeps criminis. The juror stated that Hankins was

just as credible and worthy of belief as Bradford Mitchell, who had been recently acquitted by a jury for participating in this offense. This juror stated that Mitchell had sworn that Tom Russell sold the gray mare or filley to a man named Exome. Tom Russell was also connected with this transaction as a guilty participant. Witness further stated that he informed the jury that Exome told him and his family that he bought the gray mare or filley from Bradford Mitchell and paid him six or eight dollars for it; that Exome started to leave the country with said animal, having also in possession the saddle of the son of the juror; that at Walnut Springs, he, Exome, tried to sell the horse and saddle, and referred the party to the juror to ascertain if the title was good; that a phone message came while this juror was acting as grand juror. As the phone message came to the courthouse, the juror met his son Will and got him to answer the phone; that his son told the party at Walnut Springs that Exome had not paid for the mare and the saddle belonged to him, that is, witness' son. At the time these statements were made the jury were discussing the credibility of the witnesses, especially Hankins and Bradford Mitchell; and at said time they had not agreed upon a verdict, but subsequently did agree to a conviction. This discussion occurred about midnight. They agreed upon the verdict about 9 or 10 o'clock the following morning. When the jury first went out they stood nine for conviction and three for acquittal; and before retiring for the night all had agreed to conviction but George Edmonston, who agreed the following morning, about 9 or 10 o'clock. This witness favored giving appellant five years.

Watterson was also one of the jurors who convicted appellant. Stewart's affidavit states that while he was talking to Glass, on the public square in Glen Rose, juror Watterson approached affiant and Glass, who was also a juror in attendance upon the court, and just prior to the calling of appellant's case, stated to Glass, in affiant's presence, "that we (meaning himself and Glass) had just as well go home, as they (meaning appellant and his counsel) would not take either of them upon the jury (meaning appellant's jury), as they knew too much about us (the jurors); that they knew he and Glass would convict Pete Williams, and that by God, we would send them up" (meaning Pete Williams and the other parties indicted for the theft of the same horses for which Williams was indicted). But this information was not communicated to appellant nor his counsel, nor any of his friends, until after Watterson had been impaneled, etc. Watterson was used as a witness on the hearing of the motion for new trial, and admitted making the statements imputed to him, but said he was joking, and that he knew nothing about the facts and had no prejudice against defendant. The affidavit of Denio attacks the juror Bryan, to the effect that Bryan stated, that "If they let me sit on that case I will hang them darned horse thieves;" and said to affiant, "Wouldn't you?" And affiant said "No; they would have to prove the boys guilty [meaning Tom Russell, Bradford Mitchell and Pete Williams] before I would convict them, as I would go according to

law and evidence." Mr. Bryan said that he did not have any use for the horse-thieves. "I said I didn't care if a man was a horse-thief, I would not convict him unless he was proven guilty." Mr. Bryan then said that of course "he would try to go according to the law and the evidence." That these matters were not communicated to defendant or his counsel, etc. This conversation was denied by Bryan. However, Bryan corroborated that portion of the motion for new trial in regard to the statements to Sullivan. There is some other evidence in regard to the juror Thompson. We have stated enough to demonstrate the misconduct of the jury, and for which this judgment must be reversed.

There are several bills of exception with reference to the rulings of the court in the admission of testimony, involving the statements of the different parties who were shown by the witness Hankins to be particeps criminis in the transaction detailed by his testimony. Hankins states that he was employed by appellant, Mitchell and Sullivan to go to Black Stump Valley, in Erath County, and drive from that point to Somervell County, the five horses claimed by them; that he undertook to drive them, and made a failure; that he secured the services of his brother Jim to assist him; that the horses were finally driven as far as the pasture of the witness Ham, and placed in pasture for a few days; that the parties mentioned by him, including defendant, accompanied by himself, went to this point, drove the horses and put them in the pen of one Davis, where there was a trade entered into, which Hankins says was a sham, by which a bill of sale was to be executed by him in favor of Tom Russell, one of the parties to the original employment; that he (Hankins) was to get one-half of the horses for driving them from Black Stump Valley; that the horses were then driven away from Davis' pen, and put into appellant's pasture, at least some of them were; Hankins receiving one of the animals, which he traded to his brother, and a note for $40, executed by Tom Russell, appellant and Bradford Mitchell. The bill of sale was executed in favor of Tom Russell, as agreed upon. The note and bill of sale were read in evidence, and are incorporated in the record. Appellant introduced both instruments. The trade spoken of is testified to by several of appellant's witnesses as having occurred, among others, by appellant himself, as well as Bradford Mitchell. They denied, however, any complicity in the criminal part of the transaction, claiming innocence in their connection with it. Without going into detail as to the statements admitted over objection by the different witnesses, it is sufficient to say that, in our opinion, a proper predicate was laid; that is, sufficient evidence was introduced to justify the court in admitting these declarations on the theory of conspiracy between the parties. It is necessary to make this statement because appellant denied hearing some of said statements. Though the State shows that most of them were made in such juxtaposition to appellant that he could have heard them, as he was present with the parties at the time they were made, and much of it was directly in connection with handling the horses at the pen of the witness Davis and subsequently. These statements

were somewhat of a criminative nature and character. We think these bills, explained by the court, rendered the testimony admissible.

Will Williams, while testifying in behalf of appellant, states that on the 11th or 12th of August, he prepared the bill of sale executed by Hankins, conveying to Russell the horses in question; that he remembered the circumstances of Bradford Mitchell, Tom Russell and appellant bringing the horses in controversy to their homes about that time; that he saw defendant for the first time after he brought the horses to his home, about a day or two after he had gotten them, and that he then asked defendant about said horses, and from whom and where he had gotten them. The witness was then asked by appellant's counsel to detail the statements of defendant to him about his possession of the horses and from whom and where he had gotten them. State's counsel objected to this testimony because it would be self serving and hearsay; and said counsel, in response to an inquiry form the court, stated that his purpose in offering the testimony was to show that defendant's explanation of his possession of the horses. The court sustained the objection, and the witness was not permitted to detail said statements of appellant. The witness would have testified that the first time he saw defendant, which was a day or two after he (appellant), Bradford Mitchell and Tom Russell brought the horses in controversy to appellant's home, and on the day the witness prepared the bill of sale from Hankins to Russell, which was the 11th or 12th of August, 1902, that defendant told him, in answer to his (witness') question as to how, where and from whom he came into possession of the horses, that John Hankins told him in Glen Rose on Saturday, August 9, 1902, that he had some horses in old man Ham's pasture, and wanted to trade them to him (appellant) for a buggy; that defendant, Bradford Mitchell and Tom Russell went to Ham's place on Sunday, August 10, 1902, by agreement with witness Hankins to look at the horses, and if the same suited appellant, he would trade his buggy for them; that after he got there and saw said horses, he refused to trade for the same, and that subsequently Tom Russell bought three head of horses that were in Williams' pasture, and the one that had already been placed in this pasture, from said Hankins, for the sum of $40; that Russell agreed to give Hankins his note therefor for $40, with defendant and Bradford Mitchell as sureties; that Hankins said he was willing to take Russell's note for said horses, provided he would make it secure, so that he could trade it for the buggy; and that appellant and Bradford Mitchell agreed to sign said note for the purpose of making the same secure, so that Hankins could trade it for the buggy. The court signs this bill with the explanation that the bill of sale was exhibited to the witness, and he stated that he wrote it on said occasion, and it recited the sale of horses from Hankins to Russell; and it was further admitted in evidence that the note given was also admitted in evidence and Hankins admitted signing the bill of sale and accepting the note. And he further qualifies the bill by stating that the evidence of the witness Davis shows that defendant's possession of the horses

was first questioned at his (Davis') house, in Somervell County, before» they got them to Hood County, and two or three days before this conversation should have occurred. Under the explanation of the court, the ruling was correct. If appellant was called upon at Davis' to explain possession of the horses, this preceded the conversation sought to be introduced through Will Williams; but whether this is true or not, it was a fact, not denied by the State and proved by appellant, that the matters occurred as sought to be testified by Williams. Why the State should have objected to this testimony is not easily explained, because it was the theory of the State in regard to this phase of the case that the sale was a sham and a fraud, and the bill of sale and note were executed to carry out this idea, and to cover up, as best they could by this means, the fraudulent transaction with a glamour of innocence. While we do not see any particular injury that could accrue to appellant, yet, upon another trial, it might be well enough to let this testimony go to the jury for what it would be worth.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*