ALFRED HOLLINGSWORTH V. THE STATE.

No. 3614. Decided December 16, 1915.

Rehearing granted January 12, 1916.

### 1.—Incest—Evidence—Impeaching Own Witness—Surprise.

Where, upon trial of incest, the State introduced the alleged female as a witness and had her to testify that defendant, and no other person, had the opportunity to commit the offense and which had a strong tendency that he did so, without asking her directly whether it was defendant, whereupon the witness on cross-examination testified that another man was the father of her child, and that the defendant was not guilty of improper conduct toward her, it was reversible error to permit the State to impeach its own witness by showing that she had testified differently before the grand jury, and had written a letter to defendant accusing him of the paternity of her child; it appearing that the State's counsel was informed before placing the witness on the stand that she would so testify, and that he could not claim surprise. Distinguishing Blake v. State, 38 Texas Crim. Rep., 377. Following Oates v. State, 67 Texas Crim. Rep., 488, and other cases. Prendergast, Presiding Judge, dissenting.

### 2.—Same—Evidence—Letter—Charge of Court.

Upon trial of incest, it was reversible error to permit the State to introduce in evidence the letter written by the alleged female to the defendant, some

time after the alleged offense, in which she accused him as being the father of her child, to which he made no reply, but denied on the trial that he ever received it, and upon which testimony the court charged the jury that if defendant received this letter they could consider the same as evidence of defendant's guilt.   Prendergast, Presiding Judge, dissenting.

3.—Same—Evidence—Letter—Failure to Reply to Written Communication.

   ·   Where, upon trial of incest, the State was permitted to introduce in evidence a letter written by the alleged female to the defendant accusing him that he was the father of her child, to which he made no reply but denied its receipt, and it also appeared that defendant had prior thereto denied that he was the father of said child, such letter being a mere unsworn statement of the witness, would not prove anything and was not admissible in evidence.   It is not necessary to pass on the question as to whether a letter of this character is admissible in evidence under any circumstances, but it is sufficient to say that in the instant case it was inadmissible as original testimony.   Prendergast, Presiding Judge, dissenting.

4.—Same—Evidence—Letter—Conspiracy—Duress.

   Upon trial of incest, where the alleged female testified that certain statements in a certain letter which she had written to the defendant charging him with being the father of her child were untrue and that another man was in fact and truth the father of her child, the said letter which was introduced in evidence by the State could not be used to show the guilt of the defendant, and this although she may have conspired with the defendant to have him acquitted; besides, it appeared from the motion for new trial that she was under duress when she wrote this letter.   Prendergast, Presiding Judge, dissenting.

5.—Same—Continuance—Newly Discovered Evidence—Other Assignments of Error—Practice on Appeal.

   Where the judgment is reversed and the cause remanded upon other grounds,   ·
it is unnecessary to consider assignments of error involving the question of admitting evidence, failure to charge on circumstantial evidence, of overruling defendant's motion for new trial because of newly discovered evidence and overruling his application for continuance, and these matters are not passed upon; although the application for continuance seems to have been sufficient.   Prendergast, Presiding Judge, dissenting, holding that the cause should be affirmed.

   Appeal from the District Court of Coryell.   Tried below before the Hon. J. H. Arnold.

   Appeal from a conviction of incest; penalty, ten years imprisonment in the penitentiary.

   The opinion states the case.

   *Sadler & Cobb, D. W. Odell,* and *Ramsey, Black & Ramsey,* for appellant.—On question of continuance:   Gilerease v. State, 33 Texas Crim. Rep., 619; Branch's Crim. Law, sec. 257.

   On question of court's charge on letter:   Rice v. State, 49 Texas Crim. Rep., 569.

   On the trial the State was permitted to introduce in evidence a letter from Cassie Dunn to appellant, written many months after the alleged commission of the offense with which appellant stands charged.   There was no correspondence either before or after this letter from appellant in respect to the matter to which the letter relates, that is, in respect

to that portion of same which implies a charge of guilt against him. It is clear, too, that there is not in the record any admission by appellant, either verbal or written, of the truthfulness of any statement or charge therein contained. It is also true that this letter was written some eight or nine months after the date of the commission of the alleged offense. That this letter is not admissible is clearly held, as we conceive, by all the authorities, for that the statement was made long after the commission of the alleged offense. The rule seems to be that "the admissions, to be competent against a co-conspirator must have been made pending and in furtherance of the conspiracy. If made before or afterwards, they are inadmissible unless made at the instance or with the knowledge and consent of the co-conspirator." Again it is said: "The admissions, to be competent, must not only be made at the time of the conspiracy or its execution, but must relate thereto." (Ency. of Evidence, vol. 1, pp. 593-4.) This matter we have discussed quite fully in our original argument, and deem it unnecessary to cite additional authorities on that question.

The main question involved in the case under this assignment is whether or not a letter from an accomplice after the commission of the alleged offense, not replied to, is admissible. On this question we desire to call the attention of the court, first, to the rule laid down in the latest edition of Jones on Evidence, volume 2, section 269, page 493, where he uses this language: "Letters written to a party and received by him may, under some circumstances, be read in evidence against him, but before they can be received as admissions against him there must be some evidence besides mere possession showing *acquiescence* in their contents as proof of some act or reply or statement; and in such case there must, of course, be proof that the one sought to be charged has received the letter." Again, the same author, on page 494, says: "A distinction exists between the effect to be given to oral declarations made by one party to another which are in answer to or contradictory of some statement made by the other party and a written statement in a letter written by such party to another. It may well be that under most circumstances what is said to a man to his face which conveys the idea of an obligation on his part to the person addressing him or on whose behalf the statement is made, he is at least in some measure called upon to contradict or explain; but his failure to answer a letter is entirely different and there is no rule of law which requires a person to enter into a correspondence with another in reference to a matter in dispute between them or which holds that silence should be regarded as an admission against the party to whom the letter is addressed. Such a rule would enable one party to obtain an advantage over another and has no sanction in the law." Again, the same author, on page 588 of the same volume, uses this language (after having discussed the admissibility of silence under accusations of guilt): "With respect to written communication, however, the rule is different, because the failure of one receiving the letter to answer it may be attributed to many causes besides an acquiescence in the truth of what is written and such

a rule would furnish a dangerous weapon in the hands of an unscrupulous party to make evidence in his favor against a careless opponent. It can not be said, however, to be an unvarying rule that an unanswered letter may not be evidence against the person addressed, because there are cases in which such letters have been admitted. The better supported rule probably is that on the reasonable grounds above stated unanswered letters are ordinarily no evidence against the person addressed as admissions of the truth of statements contained therein. The true rule to be gathered from the cases is that unanswered statements in letters are seldom to be regarded as admissions by the persons addressed, but that exceptional circumstances may justify the court in submitting them to the jury with the proper caution." The rule as stated in Cyc., volume 16, page 960, is as follows: "The general rule is that omission to answer a written communication is not evidence of the truth of the facts therein stated and that under ordinary circumstances a party is not required to reply to a letter containing false statements of fact. There are circumstances under which unanswered letters are competent evidence of admissions by acquiescence in the statements therein contained, as when the party receiving a letter has in any way invited the same or when there is any ground to infer that he has acted on the letter by partly answering it or otherwise recognizing it, or when with such letters goods or other articles are forwarded with bills and these are received without return or protest, or where money is sent upon terms and conditions stated in the letters and is not returned and there is no objection to or denial of the statements contained in the enclosing writing." The rule on this subject is thus cited by Mr. Wharton, in his valuable work on Criminal Evidence (vol. 2, sec. 682): "The fact that an unanswered letter or other paper is found in the possession of a party, but not acknowledged by him, is not ground for the admission of the paper as evidence against him. Were it admitted, an innocent man might, by the artifices of others, be charged with a prima facie case of guilt which he might find it difficult to repel. It is otherwise, however, when the party addressed in any way invited the sending to him of the letter, or when there is ground to infer he acted on the letter. Where such tacit recognition is claimed, the whole conversation or correspondence which constitute a recognition must be given." This general question is also discussed by Mr. Wigmore, in his work on Evidence, in section 1073m, where very many of the authorities to which we will call attention are cited. This section is so lengthy that we deem it inadvisable to insert it here. It will be noted that Mr. Wigmore probably in his text goes further than any other author towards sustaining unanswered letters. His references to some of the English authorities would, if not carefully analyzed, rather tend to oppose the position which we are seeking to maintain. We think the authorities cited above and the reasons on which they rest must and will support the proposition to which the numerous authorities hereafter noted relate, that in a *criminal case* letters unanswered containing statements of criminative facts are not to be re-

ceived under any circumstances unless possibly where, in prosecution for treason or matters of that sort, it becomes important, in respect to letters written at the time the events were moving, to show his knowledge of the action and conduct of others. Ordinarily, unanswered letters are not admissible even in civil cases, and, as the authorities note, the exception to this rule in civil cases is where, for instance, it is sought to prove demand, where such demand is necessary, letters though unanswered may be given in evidence. Another exception is where the character of one's possession is in issue and he is holding adversely, it has been permitted to make proof of a demand by a letter, though unanswered. Another exception is that, where the letter so received has been acted upon, and again where the person receiving the letter has replied to certain portions of it and his replying letter contains no denial of the other matters with which he is sought to be charged, under some circumstances such letter is admissible. Or, when goods have been sent with a letter and received and appropriated, the letter though unanswered has been admitted, and the same is true where there has been a remittance of money, and as in the Horne-Took case in England, where he was charged with treason, it was held that though unreplied to, letters found in his possession, covering the dates of the treason alleged, were admissible. Such also seems to be the ruling in De Beringer's trial, which was also for treason. These are the only criminal cases which we have found which in any way oppose the doctrine for which we contend, and we think are easily distinguishable from the case at bar. It may be that the case of Commonwealth v. Waterman, 122 Mass., 43, is in a general way opposed to our view. The statement of facts in that case is very lengthy, but the opinion is a general abstract one and does not refer to the many other Massachusetts cases which thoroughly support our position.

We propose now to consider some of the cases which sustain our position. Among these is the case of People v. Colburn, 38 Pac. Rep., page 1105. In that case Colburn was charged with robbery. There was introduced against him a letter from a friend which contained quite damaging evidence against him. The letter is set out in the opinion. In discussing the letter, the Supreme Court of California say:

"That the letter contained damaging evidence against the defendant is quite apparent. It does not in direct terms state his guilt, but the fact that the writer regarded defendant and A (Alic Knox) as being guilty is plainly inferable from his solicitude and caution to them to avoid discovery of their whereabouts. All this was well calculated to impress a jury with the belief that defendant was guilty. This letter was clearly hearsay. Were such evidence admissible against a defendant charged with crime, there would be no limit to the power of designing persons to manufacture testimony against their neighbors. It will not do to say that Moore was a friend of the defendant, and hence that the evidence was admissible. It would be quite easy for an enemy, under the guise of friendship, to indict the most damaging epistles to a victim whose destruction he was seeking to encompass. The question of friend-

ship or enmity does not properly constitute a factor in the problem. The letter was a statement of a third party, in nowise connected with defendant; was not made under the sanction of an oath, and not admissible. The possession of unanswered letters is not such evidence of acquiescence in their contents as to make them admissible in a civil case, and a letter found upon a prisoner when arrested has been held to be no evidence of the facts stated in it. Rap., Cr. Law, sec. 283; Whart., Cr. Ev., sec. 682; People v. Green, 1 Parker, Cr. R., 11; Com. v. Edgerly, 10 Allen, 184; Smiths v. Shoemaker, 17 Wall., 630. There are exceptions to the rule,—as, for instance, it is shown that the defendant has acted upon the information contained in the letter; or where he has answered it, in which case so much of the letter as is explanatory of his answer is admissible; or where the party receiving the letter has by his acts or conduct invited the sending of it to him. There was no sufficient showing to render the letter admissible under any of these exceptions."

This case, we think, very clearly states the rule. It also clearly states the exceptions to the rule in criminal cases, and they are as follows: (a) where it is shown that the defendant has acted upon information contained in the letter; or (b) where he had answered it, in which case it is stated so much of the letter as is explanatory of his answer is admissible, or where the party receiving the letter has by his acts or conduct invited the sending of it to him. On this last exception we ask the court to note particularly the case of Packer v. U. S., 106 Fed. Rep., 906, as to what is meant by the phrase "inviting the sending of the letter to him."

The next case to which we desire to call attention is the case just noted of Packer v. U. S., supra. That case was decided by Judge Wallace, circuit judge of New York. It is, in our judgment, one of the best opinions in the books on this question. We quote practically all that is said by the court in that case:

"The introduction in evidence of the Moody letter was prejudicial to the accused, and we can discover no ground on which the ruling receiving it can be upheld. It was written and sent after the offenses charged in the indictment had been committed. The correspondence between Moody and the accused while the transactions evidencing the scheme to defraud were taking place was competent, because the letters were verbal acts constituting a part of the res gestae. It was also competent because the letters from the accused were admissions of facts contained in them, and a response to the letters of Moody, and the latter were necessary to a correct understanding of the scope and effect of the admissions. It is urged that the last Moody letter was competent because it was a reply to a letter from the accused soliciting further remittances from Moody. The contention is fallacious unless it can be maintained as a correct legal proposition that a request admits in advance the statements made in response. This would be a very dangerous doctrine, and finds no color of support in the law of evidence. If only that part of the reply refusing to make further remittances had

been read, no harm would have been done; but, as has been stated, the letter was, in substance, a narrative of past events, of which there was no other evidence, and an argument to demonstrate that the accused had been guilty of a scheme to. defraud Moody. It is also urged that the letter was admissible as a tacit admission by the accused of the truth of its statements, it having been proved that the accused did not reply to it. Admissions, of course, may 'be inferred from silence as well as from express statements, but it has been uniformly held by the courts that the failure to reply to a letter is not to be treated in a criminal or in a civil action as an admission of the contents of the letter. In Com. v. Eastman, 1 Cush., 189, the court said:

" 'The letters,° however, if properly identified, would not, of themselves, authorize any inference against the defendants. They were only the acts and declarations of others; and unless adopted or sanctioned by the defendants by some reply or statement, or by some act done in pursuance to their suggestion, they ought not to prejudice the defendants. Letters addressed to an individual, and received by him, are not to have the same effect as verbal communications. Silence in the latter case may authorize the inference of an assent to the statements made, but not equally so in the case of a letter received, but never answered or acted upon. So far as these letters might be shown by other proof to have been acted upon or sanctioned by the defendants, so far they would be competent evidence.' In People v. Green, 1 Parker, Cr. R., 17, the court said:

" 'The maxim, "Qui tacet consentire videtur," has also been applied between 'the parties to certain mercantile dealings; as where an account current was sent to the party by letter, and no objection made to it within a given time, established by convenience or by commercial usage. But it could not, in principle, be applicable to facts stated in a letter which the party was not bound or interested to answer. It would be · placing a man entirely at the mercy of another if he was bound by what others chose to assert in addressing letters to him. In no case could his silence be considered an admission of such facts.'

"It could not be applicable to any case where the letter only tends to support a charge of guilt, and where it had been followed by no action, and no response on the part of the person receiving the letter. The same principle has been repeatedly applied in civil actions. Fairlie v. Denton, 3 Car. & P., 103; Learned v. Tillotson, 97 N. Y., 1; Bank v. Delafield, 126 N. Y., 410, 27 N. E. Rep., 797; Gray v. Ice Cream Co., 162 N. Y., 388, 56 N. E. Rep., 903, 49 L. R. A., 580."

It will be noted that in that case the admissibility of a letter was sought to be sustained on the ground that it was a reply to a letter from the accused soliciting further remittances from Moody. Answering this contention, the court say:

"The contention is fallacious unless it can be maintained as a correct legal proposition that a request admits in advance the statements made in response. This would be a very dangerous doctrine and finds no color of support in the law of evidence. If only that part of the reply

refusing to make further remittances had been read, no harm would have been done; but, as above stated, the letter was, in substance, a narrative of past events of which there was no other evidence, and an argument to demonstrate that the accused had been guilty of a scheme to defraud Moody."

Our recollection is that there were no letters from appellant to Cassie Dunn read in evidence on the trial. There was, as we recall, probably another letter of hers to appellant introduced in evidence and there was, as we remember, a letter or two from her father to appellant. There was proof, as we remember, that appellant and Cassie Dunn had conducted a friendly correspondence after she left appellant's place, but there is, we are pretty sure, nothing in the evidence to at all indicate that this letter was in reply to anything written by appellant and especially nothing in anything that appellant had written that had any relation to the grave charge contained in the Cassie Dunn letter.

Another valuable case is that of Commonwealth v. Eastman, 1 Cush., 189, 48 Am. Dec., 596. So much of the opinion as relates to the matter here discussed will be found on page 599, as follows:

"The letters, however, if properly identified, would not of themselves authorize any inference against the defendants; they were only the acts and declarations of others; and, unless adopted or sanctioned by the defendants, by some reply or statement, or by some act done in pursuance of their suggestions, they ought not to prejudice the defendants. Letters addressed to an individual, and received by him, are not to have the same effect as verbal communications. Silence, in the latter case, may authorize the inference of an assent to the statement made, but not equally so in the case of a letter received, but never answered or acted upon. So far as these letters might have been shown by other proof to have been acted upon or sanctioned by the defendants, so far they would have been competent evidence."

We desire to call special attention to the case of Razor v. Razor, 149 Ill., 621, 36 N. E. Rep., 963. This authority is valuable for the reason that, among others, the letter offered in evidence purported to be in response to a letter from the wife against whom it was sought to be used. We make the following liberal quotation from that opinion, which is practically all the court says on the question here involved:

"It is next insisted that the court erred in excluding from the jury a certain letter alleged to have been found by appellant in his wife's trunks, and containing a proposition to meet her in St. Louis for improper and adulterous purposes. It was shown that, while the letter was addressed to 'Gertie' (the familiar name of the wife) on the inside it was addressed to 'Mrs. Bosburg, box 99,' on the envelope containing it. It is shown, also, that a considerable package of letters was thus found, some entirely innocent, and others more or less incriminating. It is insisted that the letter excluded was one of a series, and in answer to one written by the complainant, and, having been found in the possession of the complainant, was, therefore, competent evidence. To this it must be said that there is, in this record, no evidence that it was

one of a series or that it was in answer to one written by complainant, other than that contained in the letter itself. This letter, if addressed to the wife, and found in her possession, would not be evidence against her, unless the contents had been adopted or sanctioned by some reply or statement or act done on her part, shown by proof aliunde the letter itself. While the possession of letters of this character is wholly inconsistent with the duties and obligations of a wife, it can not be said that her silence and retention of the letters necessarily imply assent to their contents. Where verbal communications are made, silence may authorize an inference of assent; but the same rule does not ordinarily apply to letters received, but never answered, or in any way acted upon. 2 Whart., Ev., sec. 1154; Com. v. Eastman, 1 Cush., 189; Smith v. Shoemaker, 17 Wall., 630. The recital in the letter that it was an answer to one received by the writer, can not be admitted for the purpose of establishing that fact. We should, in that case, have the anomaly of a letter, inadmissible in evidence, proving that it was written in reply to one from the complainant, and the fact thus proved rendering the letter admissible. Nor is there any pretense in this record that the letter was ever acted upon, or any attempt made to meet the writer."

We desire to call further attention to the case of Cómmonwealth v. Edgerly, 10 Allen, 184, which we think should be of value. The opinion in that case is by Chief Justice Bigelow of the Supreme Court of Massachusetts. While the facts in that case are somewhat different from the facts here, the following clear statement of the law ought to receive acceptance:

"An unanswered letter is inadmissible although the statements contained in it are well known to the parties to whom it is sent, and this is held on the ground that a letter written to a party by a third person to which no reply is made does not show an acquiescence in the facts stated in the letter."

Another clear statement of the rule is found in the case of Learned v. Tillotson, 97 N. Y., 1. The court there, among other things, say:

"From an examination of the cases we think that a distinction exists between the effect to be given to oral declarations made by one party to another, which are in answer to or contradictory to some statement made by the other party, and a written statement in a letter written by such party to another. It may well be that under most circumstances what is said to a man to his face, which conveys the idea of an obligation upon his part to the person addressing him, or on whose behalf the statement is made, he is at least in some measure called upon to contradict or explain; but a failure to answer a letter is entirely different, and there is no rule of law which requires a person to enter into a correspondence with another in reference to a matter in dispute between them, or which holds that silence should be regarded as an admission against the party to whom the letter is addressed. Such a rule would enable one party to obtain an advantage over another and has no sanction in the law."

This case has been approved in express terms in the more recent cases of Thomas v. Gage, 141 N. Y., 506, and particularly in Gray v. Ice Cream Co., 162 N. Y., 397, 56 N. E. Rep., 903. We have examined all the cases cited by Mr. Wigmore, in Jones on Evidence, and Wharton on Evidence and the Encyclopoedia of Evidence, and such other authorities as a fairly industrious search have developed, without finding anything to contravene the position which we have herein sought to maintain. We have cited the court to the accessible authorities, including those tending to establish the negative of our position as well as those sustaining it. It will be noticed by an examination of Mr. Wharton's work on Criminal Evidence that the exceptions noted under note 3 are all English cases and that the English authorities cited are opposed to the rule laid down in Commonwealth v. Eastman. We also call attention to section 695 of Mr. Wharton, where he discusses this exception and says: "But it should be remembered that, before the admissions of the agent can be proved, the fact of agency should first be established by other evidence. And it has been questioned whether the admissions of an agent not a co-conspirator, unless a part of the res gestae, can be put in evidence if the agent himself could be called to substantiate the facts admitted."

Now, applying these authorities to the question here before us. The court, of course, will remember that appellant stood charged with a serious crime in respect to which he had interposed his plea of not guilty and to meet which he was interposing his strongest denial. It will further be remembered that Cassie Dunn, whose letter was received in evidence, herself denied substantially every criminative fact in the case. It will also be remembered by the court that, in a motion for new trial, there was produced a sworn statement from Cassie Dunn to the effect, in substance, that this particular letter was written by her in fear, under duress and by the compulsion of her father. It will also be remembered that this letter was written in a distant county by Cassie Dunn many months after the commission of the alleged offense. If the parties could be treated as co-conspirators, the conspiracy was accomplished and Cassie Dunn stood in relation to the appellant like any other witness. Clearly the letter was hearsay and it is inconceivable to us on what theory, being a mere hearsay, unsworn statement, it could be admitted. We conceded in our original argument, as we here concede, that the State made out at least a prima facie case that the letter had been received by appellant. We think the court below and this court would under the evidence, be justified in assuming that the proof was sufficient to raise an issue and question that the letter had been received by him. True, he denies its receipt, but that was a question for the jury. It is not contended by anyone that appellant acted on this letter; on the contrary, the proof is, as we believe, conclusive that he did not act on it. It is not contended by anyone that appellant at any time, expressly or impliedly, admitted the truth of the criminative facts contained in such letter; on the contrary, the evidence is absolutely conclusive that with his latest breath he strenuously denied

such facts. It is not contended that he made any reply to this letter and its admissibility is not brought within the rule that, replying to a portion of it and omitting to reply to the criminative part, he could in any sense be held to have admitted the charges therein made. Its admission can not be justified on the ground that it was part of the res gestae, nor can its admission be justified because it was the act of a co-conspirator, because if there had ever been a conspiracy it had long since been accomplished and the crime, if there was a crime, wholly executed. Its admissibility can not be justified upon the ground, as in the Horne-Took case and others, that it was pertinent as showing knowledge, as might be true perhaps in cases of treason. It can not be admitted on the ground that goods or anything of value was sent with it and received and appropriated, because no such claim is made or can be made in this case. It is not admissible on the ground that it contained a receipt for money which was appropriated by appellant, because no money was sent and none received. Indeed, there is no exception to the rule noted by some of the authors upon which the testimony could be received. It was an unsworn, pure, bald, hearsay statement by an unsworn witness. We further contend, may it please the court, that the fact that this statement was made by Cassie Dunn does not make it any more admissible than if it had been made by her father or by the rankest stranger. If some stranger residing in Callahan County had written appellant a letter, in substance charging him with the commission of the offense for which he is here sought to be convicted, and appellant, conscious of his innocence, had thrown it in the wastebasket, what lawyer or judge would have contended that such letter was admissible? Does the fact that such a letter was written by Cassie Dunn add to its admissibility? We can not think so. In fact, as it seems to us, based on all the authorities and based on reasons that admit of no denial, the letter was inadmissible and should have been rejected. Of course, if it was not admissible as against the objection not only timely made but made with sufficient clearness and definiteness, it must result in a reversal of the case. This question has never been passed on, so far as we have discovered, and as far as we believe, in this State. Our position is maintained by all the authorities. This court ought not to lend the great weight which will naturally attach to its approval of a doctrine contrary to all law, against all precedent and reason and which might, as in this case it did. result in the conviction of an innocent man.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of continuance: Bush v. State, 40 Texas Crim. Rep., 541; Fulerson v. State, 57 id., 80; Branch's Crim. Law, sec. 257.

On question of statement before grand jury: Clanton v. State, 13 Texas Crim. App., 139; Scott v. State, 23 id., 520; Gibson v. State, 45 Texas Crim. Rep., 312; Gallagos v. State, 48 id., 58; Branch's Crim. Law, sec. 871.

PRENDERGAST, PRESIDING JUDGE.—Appellant was indicted for incest with his niece, Cassie Dunn, the daughter of his sister, was found guilty and assessed the highest punishment.

The State introduced said Cassie Dunn as its first witness. She testified on direct examination to her relationship to appellant as alleged in the indictment; that she was twenty years old June 18, 1914; that for the four or five years preceding this trial, which occurred in February, 1915, she had been living with and making her home with appellant; that when she first went to living with him his family consisted of himself and two sons, then nearly grown; that about two years after she went to live with appellant, her sister Fannie, two years younger than she, also arrived there and thereafter made her home also with her uncle; that both appellant's said sons married, one more than a year before this offense is alleged to have been committed and the other some time before that, and that both of them thereafter ceased to live with their father but had their own homes and lived at their own homes in the same community; that when these two sons of appellant thus married and removed from appellant's and established their own homes, she, appellant and Fannie constituted the family; that after Fannie arrived at appellant's and made that her home, she, Cassie, did the housekeeping, cooking, washing and milking and that when Fannie was there Fannie assisted her in the discharge of these duties; that she and Fannie had five other uncles living in the same community of appellant, appellant's brothers, whom Fannie visited from the time of her arrival at appellant's until after this offense was committed; that she would sometimes go and stay a week or two at a time, though not very often, but she would go and stay with them whenever she wanted to. "When Fannie would go away that would leave Uncle Alfred (appellant) and myself alone. When Fannie was gone I did the milking and cooking; I kept house and made up the beds, etc." That when Fannie was there she assisted Cassie in these duties; that during all that time she, Cassie, had no sweethearts or beaux and kept company with none such; that she occasionally went to parties, gatherings, singings and things of that kind but not often; that she went more before appellant's two sons were married, they taking her; that whenever she went, either appellant or one of the sons would carry her; that appellant carried her to church but did not carry her to parties and occasionally took her to town; that she left appellant's, who lived in Coryell County near Turnersville, and went to her father's home, who is shown to have lived in Clyde, in Callahan County, on June 19, 1914; that "Uncle Alfred (appellant) treated me just like he would one of his own children all the time I lived there. He treated me right,—just like he would his own girl. Anything I wanted I got it, dresses or anything else. . . . I love every one of my uncles. Yes, I expect I love Uncle Alfred better than any of the balance of my uncles. I have loved him all the time. . . . I was pregnant when I went home in June, 1914. I had been home about a month before my people found out that I was pregnant. Dr. Bailey is the

man that told them about my being pregnant. I was sick and we called in Dr. Bailey to wait on me, and he told them what was the matter with me. I have a child now. It was born the 29th of October."

The above is substantially and fully everything this girl testified on her said direct examination. It will be seen therefrom that unquestionably her testimony was favorable to the State and in no way unfavorable thereto; that it showed practically that appellant had the opportunity and he alone had the opportunity to have had sexual intercourse with this girl; that someone did, about the latter part of January, 1914, is unquestionably established, not only by her testimony, but by all the other testimony in the case.

Immediately upon her being turned over to the appellant for cross-examination he had her, the very first thing, to testify as follows: "Henry Dollins is the father of my child. My uncle never did have any illicit intercourse with me in any way. Never did ask me to. Never asked me to yield to him in any way. During the entire time that I lived with my uncle he never did undertake or try to get me to do anything that was wrong. I have just told you that Henry Dollins was the first person that ever had intercourse with me. The first time Henry ever had intercourse with me was at Hazel Ford's. Hazel Ford lived about a mile from where my uncle Alfred lived. I recall the fact that Hazel Ford and his wife went to Meridian in January, 1914."

In view of several questions raised by appellant's bills of exceptions, we deem it proper to here state what the trial judge said, and sometimes repeatedly said, in explanation and qualification of appellant's said several bills.

In one he said: "It is further apparent from the whole testimony that a conspiracy existed between the defendant and the prosecuting witness (Cassie Dunn) not only to commit the crime of incest, but to go further and suppress knowledge that the child that was to be and in fact was later born, was the fruits of the crime of incest, and the conspiracy extended even further on the part of the prosecutrix and defendant and looked to a resumption of their unlawful relations with each other as soon as the birth of the child had been accomplished and the public had been quieted, and the relatives of the prosecutrix and defendant satisfied regarding the defendant's connection with prosecutrix. It is evident also that the conspiracy extended and contemplated that both prosecutrix and defendant would deny that the defendant was the father of the child in question and commit perjury with regard thereto, if necessary, in order to keep secret the fact that said child was the offspring of incestuous intercourse, and in order to carry out their design that such intercourse might be resumed by them. . . ."

In another he said: "The witness (Cassie Dunn), though used by the State, had sworn on the trial that the defendant was not the father

·of her child and showed to be very friendly toward the defendant and willing to swear anything that she could that would be in his favor."

In another he said: "The witness was extremely unfriendly to the State and sometimes sullen and openly testified to anything that she thought would be beneficial to the defendant."

In another he said: "The prosecutrix testified adversely and injuriously to the State on the trial of this case. In fact, she was friendly to the defendant, and in his hands 'like clay in the potter's hands.'"

Bob Hollingsworth, a cousin of appellant, testified that in April or May, 1912, one morning between daylight and sun up he went to appellant's house to see him on some business, and as he walked up to the yard gate, he looked into the house and saw Cassie Dunn sitting in appellant's lap; that at the time neither Cassie nor appellant saw him, but before he could call, a dog barked, which attracted their attention; that they then both looked and saw him, and Cassie at once got up out of his lap and sat in a chair beside him.

Oscar Easter for the State testified that in the spring of 1914 he went, late in the evening from Neel Dollins to Tom Dollins to get some clean clothes, they both living in the same neighborhood of appellant; that appellant lived somewhat between the said two Dollins, and on this occasion he went by appellant's to see him; that in approaching appellant's lot he saw appellant therein feeding or preparing to feed his stock and that said Cassie went out there at that time to milk; that she at once went into the seed house. Appellant immediately followed her and while she was therein he went into the seed house; that he, the witness, then approached the seed house in such a position and close enough that he could see both the parties therein; that he then saw appellant and said Cassie having sexual intercourse.

Appellant testified and both he and said Cassie denied that they had ever at any time or place had sexual intercourse.

Appellant made a motion for a continuance on account of the absence ·of his mother and his two married daughters, Mrs. Whitley and Mrs. Ford, his two daughters living near to and in his immediate vicinity. The State vigorously contested this motion. The bill and record shows that he was indicted January 19, 1915, arrested on the 22nd, made bond the same day and that day had subpoenas issued for said witnesses, which were executed, returnable January 25th, at which latter time the ·case was set for trial. It appears that for some reason the case was reset from the 25th to the 27th of January, at which latter date Mrs. Ford was in attendance but the other two were not; that the trial of the case was again postponed for some reason undisclosed until February 3rd; on that date it seems neither of these witnesses attended. The case was again postponed till February 5th, at which time neither of the witnesses were present, though they had been notified by phone ·on the 3rd to appear on the 5th. Appellant claimed that each of them was too unwell to attend the court.

The court, in allowing and approving the bill, fully explained and ·qualified it, which was accepted by appellant and he is bound thereby.

In this explanation and qualification the trial judge showed that appellant's mother was an old woman eighty-six years old and was unable to walk without help; that she was both aged and infirm, of which appellant had absolute knowledge all the time, and her absence was no ground for continuance; that he could and should have taken her depositions, citing art. 818, C. C. P. We think there can be no doubt but that the court correctly overruled the application as to this witness. Kirkpatrick v. State, 57 Texas Crim. Rep., 17; Gregory v. State, 39 S. W. Rep., 572; Brittain v. State, 40 S. W. Rep., 297. The trial judge, in further explanation of the bill, clearly shows that what was expected to be testified by these witnesses was amply proved on the trial by other witnesses and was of matters which were not contested but conceded by the State. The bill and qualification of the judge are quite lengthy. We deem it unnecessary to copy either. We have carefully read them and the bill as qualified by the court clearly shows that no error was committed in overruling appellant's motion.

By appellant's bill No. 2 he complains that the State was permitted, on redirect examination of Cassie Dunn, to have her testify that she had a conversation with Dr. Bailey about writing to the child's father for money, his objections being that it was out of his hearing and presence, was hearsay, immaterial and irrelevant, he could not be bound thereby and it would tend to prejudice him before the jury. By his bill No. 7 he complains that while Dr. Bailey was testifying for the State he testified that when he first examined Cassie Dunn and told her she was pregnant that he told her a place where she could go and stay till the baby was born, and if the man who was responsible for her condition was able to pay for it she could go there and stay until the baby was born and they could have someone to adopt the baby and she could return to her home and that noboby would ever know anything about it; that it would take a good deal of money to do that, and that Cassie said she could get plenty of money. Appellant objected to this testimony for the same reasons as to that of Cassie in bill No. 2. The court explained each of these bills and shows that in effect this testimony of Cassie Dunn was brought out on his cross-examination of her and with reference to the writing of a $300 letter introduced in evidence. Besides, as to bill No. 7, the court further states that appellant did not object to Dr. Bailey stating the whole conversation he had with Cassie in explanation of his attitude and that he understood it was agreeable with appellant's attorney for the doctor to make said full statement and that the objection he made was not to its admissibility but went rather to the weight of the testimony. As explained by the judge neither of these bills shows any error.

Appellant has several bills of exceptions as to what the State proved was testified to by Cassie Dunn before the grand jury and the admission in evidence of her written sworn statement made before it, and of her other testimony and conduct before the grand jury. Said written statement is as follows: "Jan. 11, 1915. Miss Cassie Dunn being duly sworn testified: For about the past four years I have lived with Uncle

Alfred Hollingsworth, near Turnersville, in Coryell County. When I went there to live his family consisted of himself, his two boys, Roy and Joe, and Grandmother H. lived there about half of the time. Roy and Joe both married about October, 1912, and moved to themselves. Me and Fanny lived there all the time. My brother William lived the most of his time with the other kinsfolk. I did the cooking, the milking and the general housework, and Fanny helped me. My baby was born October 29, 1914. I never had any intercourse with but one man in my life. The first time I ever had intercourse with this man was when I was about nineteen years old. I had intercourse several times. I never had any sweethearts. I told Uncle Alfred not to tell who it was. He knows who it is and he is the only one I ever told who it was and he will not tell. I won't tell who it was. Fanny wrote the letter you have shown me dated November 22, 1914. She wrote it for Uncle Alfred. Somebody else wrote the one to father, but Uncle Alfred signed it. That is his handwriting. I received that letter through the mails. I wrote the letter you have read me dated November 24th to my uncle. I knew I was doing wrong. I would not have yielded my virtue to any man that did not have my respect and confidence. I had intercourse with the man in different places, both night and day. Uncle Alfred knew when I left to go out West that I was pregnant, and I promised him not to tell it. He knows who it is. The things I said in that letter are true. Cassie Dunn." We will discuss the questions raised by these bills without taking them up separately. We have given above the substance in full of Cassie Dunn's testimony on direct examination when first introduced by the State. A careful and thorough consideration of these bills, as qualified by the court, and unquestionably sustained by the record, shows that the State, in no instance and at no time, attacked or attempted to attack the said testimony given on direct examination of said Cassie Dunn. Her said testimony, as stated above, tended, we think, with considerable force, circumstantially, to show appellant's guilt. There is no indication by her testimony on direct examination which shows or tends to show that she failed to remember or refused to testify, or failed to make the State's case. On the contrary, it was shown by her testimony on cross-examination at various times and in its various phases, that her testimony tended, and if believed, would have shown appellant's innocence of the crime with which he is charged. Under such circumstances there can be no question, both by the statute itself (C. C. P., art. 815) and a long and uniform line of decisions, that the State could impeach and attack her as to such testimony so given by her on cross-examination. The fact, if so, that the State's counsel knew or had information that this witness on cross-examination might give testimony materially injurious to the State's case would not and could not preclude the State from introducing her as its witness to prove as it did material facts against appellant by her. As to these material facts only, the State had her to testify as stated above. The State never at any time sought to impeach her or attack her testimony drawn out by its direct examination,

but it was only that which was given by her at appellant's instance on cross-examination. Appellant seeks to apply that well established rule that it is error for the State to impeach its own witness where such witness merely fails to remember or refuses to testify or fails to make out the State's case, that a mere failure to make proof is no ground for impeaching such witness. Mr. Branch in his Criminal .Law, section 866, lays down the above rule and cites many decisions of this court to that effect. Appellant cites only some of these cases cited by Mr. Branch. In other words, Mr. Branch cites a larger number of cases establishing this rule than does appellant herein, but they are all on the same line. The true rule applicable in this case is prescribed by our statute. It is (C. C. P., art. 815) : "The rule that a party introducing a witness shall not attack his testimony is so far modified as that any party when facts stated by the witness are injurious to his cause, may attack his testimony in any other manner except by proving the bad character of the witness." That is the rule and the only rule applicable in this case and was followed by the trial judge.

Appellant has several other bills, one of which was expressly refused by the court. Others so modified by the judge's qualification as to practically refuse them. And as so modified and qualified by the judge none of them present error. It is unnecessary to state them.

Appellant most vigorously attacked the testimony of said Oscar Easter as false, recently fabricated and corruptly induced by Henry Dollins and his brothers. Under the circumstances the court committed no error in permitting the two brothers of Henry Dollins, whom Cassie Dunn said was the father of her child, to testify to facts which circumstantially corroborated said Easter, over his objections, that their testimony was immaterial and irrelevant. McGrath v. State, 35 Texas Crim. Rep., 413 ; Wade v. State, 37 Texas Crim. Rep., 401 ; Hamblin v. State, 41 Texas Crim. Rep., 135 ; Ball v. State, 44 Texas Crim. Rep., 185 ; Lamb v. State, 55 Texas Crim. Rep., 323, and other cases collated in Branch's Crim. Law, sec. 46.

There is no question but that the other bills, as explained and qualified by the trial judge, show such a state of facts as that Cassie Dunn wrote to appellant a certain letter asking for $300. In fact, appellant acknowledged receipt of that letter but claimed to have lost it. That it was written by Cassie Dunn to him, received by him and lost or destroyed, was clearly established. So that not only did the State have the right to cross-examine him about it, but to introduce secondary evidence of its contents, and none of appellant's bills on that subject, as qualified, show any error.

Other bills, as qualified by the judge, clearly show that Cassie Dunn, soon after the birth of her child, wrote and had mailed to appellant a letter, a copy of which is as follows:

"I don't want to tell you a lie and I will not if the truth kills me. You know what you thought was the matter with me. It was so. It came the 29th of last month. It is a boy and all right. Has the bright eyes. I intend to bring it to Ft. Worth to one of the rescue

homes. You know it was nobody else but you, but I will die before I will tell it. I have told Pa a story. Never told you any stories. You may think I am not as good as I was. I know I am to blame for it. So you see what I wanted with the money. It was for Bailey. He charged me fifteen dollars, so you see that would be enough for me to go' to Ft. Worth. I can't help what Pa wrote down there. He has done everything he can to get me to tell him. I'll die first. I told you I would not tell and I have not yet; do as you like, cast me off if you want to but I'll never tell it. I spent my money for fruit and the rest for the boy some close for the boy and that is why I wanted you to come to meet me. I wanted you to see him. Don't let Fanny read this. (On the back of this page is the following): 'A. M. Hollingsworth. Fanny don't you open this. Uncle Alfred, you open it yourself.' " He denied the receipt of this letter, but the State established such a state of facts as would justify the trial judge and the jury to believe that he did receive the letter and his denial of the receipt thereof was false. Cassie Dunn's father, without her knowledge, took a copy of the letter to appellant and the address thereon, and he and Dr. Bailey at the time examined and compared the original with the copy he retained. If the letter was received by appellant, which he denied, he had lost or destroyed it and failed to produce it on this trial. Under the circumstances the copy of the letter and asking the various witnesses thereabout was clearly admissible.

On the theory that he had demonstrated to the jury that said Easter's testimony was false and that where he placed himself he could not have seen the act of incestuous intercourse between appellant and Cassie Dunn, he asked a charge on circumstantial evidence which the court refused. We think it would have been improper for the court to have given a charge on any such assumption. We have studied the record and statement of facts in connection with this matter and we think the lower court would not have been justified in taking that question from the jury by giving such charge. Whether his testimony or whether the testimony of the witnesses from their standpoint testifying that he could not have seen what he testified he did see, was correct or incorrect, was a question for the jury.

Among other things the court charged the jury as follows:

"You are further instructed that if you find from the evidence that the witness Cassie Dunn in her testimony before the grand jury stated facts relating to the defendant's connection with the alleged crime of incest differently from the way she testified on the stand in the trial of this case, then you can only consider her testimony before the grand jury for the purpose of enabling you, if it does enable you, to do so, in passing upon the credibility of the witness Cassie Dunn, and of determining the weight you will give to her testimony. Her testimony, as she gave it upon the stand in this case, must be regarded as her evidence in your deliberations. Her statements made to the grand jury, if any different to what she testified, can not be considered as evidence of the defendant's guilt, but only for the purpose aforesaid of aiding

you in determining the credibility of the said witness, if it does aid you in that regard.

"You are further instructed that if you do not believe from the evidence beyond a reasonable doubt, that the defendant received the letter, a copy of which has been exhibited in evidence before you, you will not consider the same for any purpose, except that of aiding you, if it does aid you, in determining the credibility of the witness Cassie Dunn, but you may consider it for that purpose only. However, if said letter was received by the defendant you will determine the weight you will give to the same under the instructions given you in the last paragraph of this charge." We think appellant's criticism of the last three lines of the second paragraph, claiming that it was on the weight of the evidence, is untenable. Taking the charge as a whole, it was proper for the court to charge as he did under the evidence. If the jury had not believed beyond a reasonable doubt that appellant received that letter—there was ample evidence for them to conclude he had, but as he denied it the question had to be submitted to the jury for a finding—then it was necessary for the court to tell them that they could not consider it at all. But, on the contrary, that if they believed he did receive it, then they could consider it only on the question of the credibility of Cassie Dunn, and under the circumstances, adding the latter clause to it and qualifying it with the first paragraph just above quoted, can not be construed to be on the weight of the testimony, but it was merely submitting the question to the jury. It is embraced within the rule about a confession which is denied by an accused. Besides, the court not only required the jury to believe affirmatively all the facts essential to convict appellant, otherwise to acquit him, but told them he was presumed to be innocent until his guilt was established by legal evidence beyond a reasonable doubt and in case they had such doubt to acquit him. And also that they were the exclusive judges of the facts proved, the credibility of the witnesses and the weight to be given to their testimony.

Appellant has two bills of exceptions complaining of the argument of the district attorney. As qualified by the judge it is shown that the argument objected to was provoked and in answer to that of appellant's attorney, and neither presents error. Sinclair v. State, 35 Texas Crim. Rep., 130; Baker v. State, 4 Texas Crim. App., 223; Chalk v. State, 35 Texas Crim. Rep., 116; Ray v. State, 35 Texas Crim. Rep., 354; Campbell v. State, 35 Texas Crim. Rep., 160; Martin v. State, 41 Texas Crim. Rep., 242; Pierson v. State, 21 Texas Crim. App., 14; Norris v. State, 32 Texas Crim. Rep., 172; Williams v. State, 24 Texas Crim. App., 32; Vann v. State, 48 Texas Crim. Rep., 11; Hilcher v. State, 60 Texas Crim. Rep., 180, 131 S. W. Rep., 592; Washington v. State, 35 Texas Crim. Rep., 154; Mooney v. State, 76 Texas Crim. Rep., 539, 176 S. W. Rep., 52.

The only other question necessary to mention is appellant's motion for a new trial on the ground of newly discovered evidence. The court, as the record shows, heard evidence on this. The motion itself and

the affidavits attempting to support it and the statement of facts thereon are quite lengthy. We have carefully studied the question and the record on the subject. We deem it unnecessary to go into any statement of it. Suffice it to say that we think the trial judge correctly held that the appellant was not entitled to a new trial on that ground and we think would not have been justified in granting a new trial. The judgment is affirmed.

*Affirmed.*

## ON REHEARING.

### January 12, 1916.

HARPER, Judge.—This case was affirmed some time ago, and Presiding Judge Prendergast in his opinion explains, in a great measure, the delay in acting on the motion for a rehearing. The writer of this opinion wants to admit that he conferred with and discussed with the Presiding Judge the opinion in this case before it was handed down, and he at that time concurred with him in the opinion that the case should be affirmed, but a further study of the record, the briefs filed by able counsel, and the authorities bearing on the questions involved, has led him to the opinion that he was in error. If he had written the original opinion he would feel less reluctance in now holding that the record presents error, because he, in a measure, feels that he may be in part responsible for the errors in which he now believes appear in the holding in the original opinion, and he wishes to assume his full responsibility for such opinion. Yet, while doing so, he feels it his duty, as a member of this court, when convinced of his error, he should unhesitatingly admit his error, for every man in this State, regardless of how guilty he may be (if guilty he be) is entitled to a trial in accordance with the settled rules of law, and if he has not received such a trial, to have his case reversed in order that he may be accorded a fair and impartial trial, and his guilt or innocence passed on by a jury only on evidence legally admissible.

We think the court erred in holding that the State could impeach its witness Miss Cassie Dunn. The State called her as its first witness and had her testify:

"My name is Miss Cassie Dunn. I suppose I am a daughter of Tom Dunn. My mother was Bettie Dunn. She was a sister to Alfred Hollingsworth. For the past four or five years I have been living and making my home with Uncle Alfred Hollingsworth. He lives up close to Prairie View, up close to Hurst in Coryell County. When I went to Uncle Alfred's to live the family consisted of himself and two boys, Roy and Joe. Roy and Joe stayed at home two years. When the boys married Joe left home and Joe went right straight and Roy stayed at home till January. They have been married two years last October. Yes, I am speaking of the old man's two boys, Roy and Joe. They married in about October, 1912. They have been living to themselves ever since they were married except Roy stayed there at his father's

from October to January and then left. Roy left there January 1, 1913. He has been away the first of this year makes two years. After the boys left Uncle Alfred and myself and Fannie constituted the family. Fannie was not there till two years ago last August. Fannie came there in August before the boys married in October. Fannie came there two years ago last August. She came in August, 1912. I am twenty years old. Was twenty years old the 18th day of last June. Fannie and I both did the housekeeping and cooking and washing dishes and milking and things of that kind for Uncle Alfred. We both did it together. Sometimes Fannie would leave there and go to her other uncles and visit, but she did not go very often and did not stay very long. Sometimes she would go and stay a week or two at a time. She did not do that very often. My uncle had five brothers that lived up in that neighborhood and Fannie would go and stay with them whenever she wanted to. When Fannie would go away that would leave Uncle Alfred and myself there alone. When Fannie was gone I did the milking and cooking. I kept house and made up the beds, etc. I attended to all that when she was not there. When Fannie was not there she did not do any of the work and of course I did it, but when she was there she assisted me in it. I did not during that time have any sweethearts or beaux that went with me. Did not have any beaux or keep company with anyone. I went to parties and gatherings and singings and things of that kind during that time, but goodness I don't know how often I went to them. I went a good deal, for a while and then I did not go so often but I went enough I suppose. I went a good deal the first two years, before the boys married. After the boys married I did not go so much because I did not have anybody to go with me. When I did go Uncle Alfred and first one and then another would carry me. Uncle Alfred carried me to church but he did not carry me to parties. He would carry me to town occasionally. We lived four or five miles from Turnersville. That is not where we did our trading. We did it at Hurst and Clifton. Clifton was about fifteen miles from where we lived. That is a larger town than Turnersville. I went home and left my Uncle Alfred's house on the 19th day of June, 1914. Uncle Alfred treated me just like he would one of his own children all the time I lived there. He treated me right—just like he would his own girl. Anything I wanted I got it. Dresses or anything else. Q. Do you love your Uncle Alfred? A. I love every one of my uncles. Yes, I expect I love Uncle Alfred better than any of the balance of my uncles. I have loved him all the time. I love every one of my uncles.

"I was pregnant when I went home in June, 1914. I had been at home about a month before my people found out that I was pregnant. Dr. Bailey is the man that told them about me being pregnant. I was sick and we called in Dr. Bailey to wait on me and he told them what was the matter with me. I have a child now. It was born the 29th of October." This was all her testimony on direct examination.

Why did the State call this witness and have her testify that she

lived with appellant; that she loved him better than she did either one of her other uncles; that she and her sister lived alone with appellant. That while she had lived with her uncle (appellant) she had no beaux or sweethearts; that she was pregnant when she left appellant's home in June, and that a child was born to her on the 29th of October, etc.

By the indictment appellant was charged with having incestuous intercourse with this witness—his niece. Were not all the above facts and circumstances elicited from the girl to prove by circumstantial evidence that appellant was the father of her child; that no other person had opportunity, and would not the evidence thus adduced by the State have a strong tendency to show that he was guilty of the charge, if no other testimony was adduced from her? The State having before the trial been informed by the witness that she would testify that another was the father of the child, and appellant had never had intercourse with her, could it adroitly, by not asking her who was the father of the child, adduce testimony from her that would fasten the crime on him, and appellant not be permitted on cross-examination to ask her who was the father of her child and elicit from her the following facts: "Henry Dollins is the father of my child. My uncle (appellant) never did have any illicit intercourse with me," without making the girl his (appellant's) witness? If the State had not known the girl would so testify before they called her as a witness, there is no doubt they could impeach her as to those statements. But the record places it beyond question, and it is in no way controverted that the girl had told the district attorney the week prior that she would testify that Henry Dollins was the father of her child, and her uncle, appellant, had never at any time had intercourse with her, and this was the reason the State avoided asking that question, yet the State called her as a witness and proved all other and different facts it could by her that would tend to fasten the crime on appellant. She testified: "That night when you and Mr. Cobb and my uncle and father all came down there with Mr. Calloway, the district attorney, you all left the room and left Mr. Calloway and I in the room to talk the matter over. I told Mr. Calloway then and there that Henry Dollins was responsible and that my uncle was not responsible." When can the State impeach its own witness? At common law it could never do so, but by virtue of our statute, article 815, it is provided, when facts stated by the witness are injurious to the cause of the party offering the witness, he may be impeached as to such testimony. The only case which we have found that would seem to sanction the action of the trial court in permitting Miss Dunn to be impeached is Blake v. State, 38 Texas Crim. Rep., 377. In that case it was held that the party offering the witness need not be surprised by the testimony, if he had good reason to believe that when the witness was called on to testify he would testify to facts beneficial and not injurious to his cause. In this case the State can not and does not contend that it had any reason to believe that she would testify that her uncle, appellant, had had intercourse with her. She had been before the grand jury, and there had refused to testify who was the

father of her child, although the record makes it manifest that she at that time knew they were investigating as to whether or not appellant had had incestuous intercourse with her, but after going before the grand jury she had told the district attorney that appellant had not had incestuous intercourse with her, and that Henry Dollins was the father of her child, and with knowledge that she would so testify, the State calls her as a witness and adduces from her facts and circumstances which would tend to show that appellant was guilty of the incestuous intercourse, knowing at the time if asked the question she would most emphatically deny such to be the fact, and for this reason propounds no such question. The State desired the jury to believe her when she testified to facts and circumstances tending to show his guilt, and introduced her to prove those facts and circumstances, but claims the privilege of impeaching her as a witness when she testifies to a fact to which they knew she would testify that would show that no such fact should be deduced from the facts and circumstances that they had called her to prove. In Oats v. State, 67 Texas Crim. Rep., 488, 149 S. W. Rep., 1194, we held that under such circumstances a witness could not be impeached, and we believe the rule there announced applies to the State as well as to the defendant. And the identical question here involved was passed on by this court in Perrett v. State, 75 Texas Crim. Rep., 94, 170 S. W. Rep., 316, being an incest case, and it was there held: "The State will not be permitted to put a witness on the stand, knowing that the testimony would be adverse, in order to get in another statement which would be beneficial to the State. If the State had expected her to swear to the intercourse, and she had denied it, then perhaps the prosecution might have introduced this testimony by way of impeachment, but not so when the State was fully aware she would not so testify when placed on the witness stand." And in Scott v. State, 20 S. W. Rep., 549, this court said: "The statute is for the protection of those whose cause is unexpectedly injured by the witness." The State, knowing she would testify that appellant had never had an act of intercourse with her and that Henry Dollins was the father of her child, yet called her as its first witness to prove facts and circumstances that would lead the jury to find that he had had intercourse with her. This was the whole purpose and sole purpose of the testimony adduced from her by the State, and the purpose of introducing her testimony before the grand jury was not to show that the witness was wholly unworthy of belief, but that appellant was guilty of the crime. The statement that Henry Dollins was the father of her child, and that appellant had never had intercourse with her in nowise conflicted with her testimony before the grand jury, except in so far as the circumstances stated before the grand jury might have a tendency to show appellant's guilt. When before the grand jury she refused to state who was the father of her child, and with whom she had had intercourse. Her testimony on this trial in nowise conflicted with that statement. We are, therefore, of the opinion that the court erred in admitting the statement made by the witness before the grand jury to impeach her. And also the

letter written in November, 1914, by her, in so far as it was admitted to impeach her testimony given on this trial. But if in error in so holding, as to it being admissible to impeach her, then we are called on to pass on the question of whether or not the letter was admissible in evidence as tending to show the guilt of appellant, and could be considered by the jury for that purpose if he received it. The court specifically in his charge authorized them to so consider it, if they found that he received the letter. We will not pass on the question as to whether or not a letter of this character is admissible under any circumstances, but simply hold that under the facts of this case such letter was not admissible as original testimony to show that appellant was guilty of the crime of incest. Appellant's counsel have filed a very able and exhaustive brief, contending that under no circumstances could such a letter be admissible as original testimony tending to show the guilt of the person on trial. This brief will be published in connection with this opinion in the official reports. Presiding Judge Prendergast exhaustively reviews the authorities which would tend to hold that such letter is admissible under certain circumstances as original testimony as tending to show the guilt of the accused. We do not think the facts of this case bring the letter within the rules of law cited by our Presiding Judge. He cites Wigmore on Evidence, section 1073, and other sections. Mr. Wigmore states, "the different situations (in which such instruments become admissible) may be grouped under four heads: (1) Documents seen; (2) documents found in possession; (3) documents of demand, received but not answered; and (4) documents made use of." And in dealing with the third says: "The failure to reply to a written communication may sometimes suffice to permit an inference of the party's assent to the correctness of the statements made therein. But the inference is not ordinarily so strong; and judges have always pointed out that the failure to reply in writing to a written communication does not have the same significance as a failure to reply orally to an oral communication. So far as any definite rule is concerned, it seems impracticable, and the precedents indicate that each case must stand upon its own facts." Under this text he cites Hill v. Pratt, 29 Vt., 119, which holds: "It would seem that the rule has never been extended to unanswered letters, particularly when the fact stated has relation to past transactions and upon which no future action of the party is contemplated." Many other cases will be found cited under this section of Wigmore, and they make it evident to our mind that under the rule as stated by that author, the letter in this case was inadmissible. The father had written appellant in July charging him with being the father of his daughter's child. Appellant replied at once, indignantly denying the fact. When the charge was renewed in November, why was he called on to reply again, having denied it when first charged by letter? Is one compelled to answer letter after letter, if he has answered the first denying the charge, else the subsequent letters will be admissible as an admission of guilt? We do not think so. The most that can be said, under the facts in this case, is that the girl

wrote the letter, and appellant received it. He in no way acted on the letter. He denies ever having received it, and while it may be said the testimony would support a finding that he did receive it, yet if he did do so, all he did was to destroy it and make no answer thereto, having already written to the girl's father denying the accusation. This was but an unsworn statement of the girl contained in a letter. This could legally prove no fact. Appellant can be said to have completely and entirely ignored the letter. It may be that the State could have asked the girl if she did not write such a letter to appellant and he not answer it, on the theory that when one is charged with crime his conduct and failure to act may be considered as evidence against him, but this would not render the letter admissible as evidence that he was guilty of the crime. It is his act, not hers, which the law considers as evidence of his guilt. The letter is copied in the original opinion, and we do not, therefore, deem it necessary to here copy it, or state its contents. It charged appellant with being the father of the child. The witness Cassie Dunn testified on the trial that she wrote this letter and gave it to her father to mail. Her father testified he took a copy of the letter and mailed it. This copy was introduced in evidence. After testifying she wrote the letter, Miss Dunn testified, when asked if the statement contained in the letter were true or false: "It was false. I told you once that the statement in the letter as to my uncle being the father of my child was false." In his charge the court tells the jury if they find that the defendant received this letter they would be authorized to consider the statements contained therein in passing on the guilt or innocence of appellant. We know of no rule of law which would authorize an unsworn statement of a witness to be considered as evidence of one's guilt, where the witness swears on the trial that the unsworn statement is untrue. Such statement may be used at times to impeach a witness, but never to prove a fact against a person on trial. The witness swore the statement contained in the letter, that appellant was the father of her child, was not true. It may be that they conspired and concluded to acquit appellant; that her testimony on the trial was untrue, but it is only testimony which some witness swears on the trial is true which can be considered in passing on the guilt or innocence of the person accused of crime. An unsworn ex parte statement is never evidence of that fact. Attached to the motion for a new trial is an affidavit of this girl in which she swears: "I further state that I wrote the two letters which my uncle had and which were offered in evidence upon the trial of his case after my child was born, and also one which my father copied under compulsion from my father. My father, after the birth of my child, told me I had to write these three letters or he would whip me. I did not want to write them for they were not true, but in my condition I thought I had to do it. I did not know why my father so insisted upon my writing these letters until since I have come back home. Recently my stepmother went to Abilene to visit, and before she left she told me not to visit

Mrs. Guy Thomas. After mother left Mrs. Thomas came to our house and told me that the reason my father made me write the letters was, that my stepmother had threatened to leave him if he did not. Mrs. Thomas told me that my stepmother told her that she had told papa that if he did not make me lay my condition on Uncle Alfred she would leave him. She also told Mrs. Thomas that if I would lay it on Uncle Alfred, papa could get a thousand or fifteen hundred dollars out of Uncle Alfred to keep it out of court. I never told any of this to anyone until after the trial of Uncle Alfred. I did not want to do it on account of papa."

It may be that appellant is guilty, as is so strenuously insisted on by our Presiding Judge in his opinion overruling the motion for a rehearing. This we do not care to discuss, nor express an opinion on, but we do hold that no person's liberty ought to be taken away from him and he branded as a felon upon the unsworn statement of a girl contained in a letter, which she swears is not true, and which, in affidavit attached to a motion for a new trial, she swears she was compelled to write by her father while she lay sick shortly after child birth, and which she says was written to obtain money from appellant. The law does not sanction blackmail any more than it does the crime of incest. We do not think anyone could read this record and say that unless the jury had been authorized to consider this letter of Cassie Dunn as evidence of the guilt of appellant, the jury would beyond question have found appellant guilty and assessed against him the highest penalty known to the law for the crime of incest.

Appellant is a man fifty-nine years of age. He had lived in the same community for twenty-eight years immediately preceding his trial. His wife had been dead for twenty years. He had raised a family of boys and girls, and when he offered to prove by his neighbors that during all these years he had lived the life of a peaceable, law-abiding citizen and a virtuous man, the State admitted as a fact "that the defendant has been a peaceable, law-abiding, quiet citizen all the time that he lived in that community; that his reputation up to the time of this occurrence has been that of an honest, upright and virtuous citizen." It may be that in his old age he has committed this crime, and if so the punishment is none too severe, but before the writer can consent that his reputation of a lifetime of upright citizenship be taken from him and he incarcerated in prison walls, it must be done upon testimony which the law says is legal and competent and not upon unsworn statements of the girl, which she swears on the trial are false and untrue.

There are other questions in the case, and especially the first application for a continuance, which the writer thinks present error, but we do not deem it necessary to discuss them. The witnesses for whom the continuance was sought can be had on another trial, if granted, and if not a discussion of that question would be of no avail.

Being of the opinion that at least that portion of the charge of the court which authorized the jury to consider the letter written by the girl as evidence of appellant's guilt, under the facts in this case, pre-

sents error for which the judgment should be reversed, we think the motion for a rehearing should be granted and the judgment reversed and remanded for another trial.

As before stated, upon the other questions presented not herein discussed, the writer expresses no opinion, as he does not deem them essential to a disposition of the case.

The motion for a rehearing is granted, the affirmance is set aside, and the judgment is reversed and the cause remanded.

*Reversed and remanded.*

DAVIDSON, JUDGE.—I agree to the reversal.

DAVIDSON, JUDGE (concurring).—Reviewing the record in the light of the motion for rehearing, I am concurring with Judge Harper in reversing the judgment. I do not purpose to enter into a lengthy discussion of the facts; they are sufficiently set out in the opinion written by our Presiding Judge and Judge Harper. The letter, under discussion in those opinions, in my judgment, was not admissible either as original or impeaching evidence. The State was fully aware of the fact when they placed Cassie Dunn on the stand as a witness that she would not testify that appellant had intercourse with her, or was the father of her child, but that she would testify that Henry Dollins was the child's father. Before the grand jury she refused positively to name the author of her shame, but some time before the trial of the case she had informed the prosecution of the fact that she would not testify to her uncle's guilt but would testify that a man by the name of Dollins was the father of her child. This was communicated by Cassie Dunn to the State some time before she was placed on the witness stand. So any question of surprise was eliminated. She had not misled the State in any way, therefore they were not only not expecting her to testify that appellant was the father of her child but knew she would not. This is not a case like Blake v. State, 38 Texas Crim. Rep., 377, where the witness had sworn to a state of facts and subsequently testified contrary to those former statements. Judge Hurt in that opinion held that the party placing the witness on the stand has the right to expect him to testify as formerly, but the facts in this case are different. This witness had not testified to her uncle's guilt, or at least of the fact that he was the father of her child, and had informed the State she would not so testify, yet in the face of this she was placed upon the stand as a witness and testified that Dollins was the father of her child. It is a settled rule that where a prosecuting witness does not testify as expected, the State can not prove its case by showing as original testimony statements of the witness made outside of court contradictory of those testified on the trial. Dunigan v. State, 38 Texas Crim. Rep., 614. For collation of authorities see Rose's Notes, vol. 5, p. 1207; Goss v. State, 57 Texas Crim. Rep., 557; Harris v. State, 68 Texas Crim. Rep., 208. It is a well settled rule that failure to make proof is not sufficient as a predicate for impeachment. Largin v. State, 37 Texas

Crim. Rep., 574; Bennett v. State, 24 Texas Crim. App., 73; Smith v. State, 45 Texas Crim. Rep., 520; Scott v. State, 52 Texas Crim. Rep., 164; Wells v. State, 43 Texas Crim. Rep., 451; Owens v. State, 46 Texas Crim. Rep., 14; Hanna v. State, 46 Texas Crim. Rep., 5; Skeen v. State, 51 Texas Crim. Rep., 39; Quinn v. State, 51 Texas Crim. Rep., 155; Shackelford v. State, 27 S. W. Rep., 8; Finn v. State, 47 S. W. Rep., 1015; Knight v. State, 65 S. W. Rep., 88; Goss v. State, 57 Texas Crim. Rep., 557. There are many other cases that might be cited in support of this proposition, but these would seem to be ample.

The State would not be authorized to place Cassie Dunn on the stand with full knowledge that her testimony would exonerate defendant and inculpate another as the guilty party, and successfully then offer another statement of hers made out of court which would be beneficial to the State. Perrett v. State, 75 Texas Crim. Rep., 94, 170 S. W. Rep., 316. I do not care to amplify this matter.

This is the only question in the case that I care to discuss. I think the exception to the court's charge was well taken, but I do not care to enter into a discussion of that question.

I, therefore, concur with Judge Harper in granting the motion for rehearing and reversing and remanding the judgment.

PRENDERGAST, PRESIDING JUDGE (dissenting).—This case was affirmed, and the opinion rendered, on June 16, 1915. On June 29th following,—after this court had adjourned to October 4, 1915, appellant, by his able attorneys who represented him in the court below and in this court on the original submission, filed a motion for rehearing on these grounds only:

1. Claiming that this court erred in holding against him on his bills and propositions thereunder relative to the testimony of Cassie Dunn, as set out in pages 1, 2 and 3 of the opinion, and further contending that the judge's qualifications were unauthorized and this court in effect should disregard them. I think his contentions on this point are not well founded and can not be sustained. I further believe that the record bears out the district judge in his qualifications to the bills.

2. His next ground is, in effect, that the court erred in overruling his motion for a continuance. He also claims that the explanation made by the judge to his bill on this question is not borne out by the record. I have again examined this question, and think the judge's qualification is borne out fully by the record. I stated it sufficiently in the original opinion.

3. His only other ground for a rehearing is his claim that the court erred in overruling his motion for a new trial because of his claimed newly discovered evidence. I have again reviewed this question, and am well satisfied that no reversible error was committed by the court on this ground. He heard all the testimony, saw the witnesses and their manner of testifying, the manner of direct and cross-examination, and was better able to judge their veracity, etc., than this court possibly could. Lamb v. State, 74 Texas Crim. Rep., 301, 169 S. W. Rep., 1158.

As stated, the above three grounds are the only ones made the basis of the motion for rehearing herein. At the instance of appellant's other eminent attorneys, evidently engaged by him after the original decision and filing of his motion for rehearing herein had been had, the submission of this cause for rehearing was postponed for some weeks in order that they might further brief for him said motion. They then filed quite a lengthy and able brief and argument. Later, they were given additional time, and then filed still another brief.

Without any complaint whatever by appellant in his motion for rehearing, in said brief, he now urges two other grounds:—in one that the trial court erred in admitting in evidence the letter of Cassie Dunn to him, copied in the original opinion; in the other, to the latter sentence of the court's charge to the jury relative to their consideration of this letter. This charge is also copied in the original opinion.

First, as to the admissibility of said letter. It is conceded by appellant that the objection to the copy, because a copy and not the original, is under the proof, not well taken. He seems to concede in one place in his brief, "that letter and the inquiries made concerning it *may* have been admissible on redirect examination of Cassie Dunn, with a view of refreshing her memory, with a view of inducing her to confirm and admit statements theretofore made, or even for the purpose of contradicting her." But his urgent and vigorous contention is: "If the original letter had been presented and it was conceded that it had been received by appellant and it were shown beyond controversy that it was produced from his possession it would not have been admissible," and he asserts he will "demonstrate this." I think the reverse of his contention is the law and can be demonstrated to be so, both by reason and authority. His *seeming* concession that the letter *may* have been admissible for said certain purposes, and his immediate insistence that it was inadmissible, are, at least, apparently inconsistent and contradictory.

The witness Cassie Dunn was unquestionably "extremely unfriendly to the State," and "testified adversely and injuriously to the State" on appellant's examination of her, and "openly testified to anything she thought would be beneficial to the defendant," and was, "in his hands, 'like clay in the potter's hands,'" as stated by the trial judge, and is abundantly established by this record. And, at his instance, and upon his examination of her, he had her to testify specifically: "Henry Dollins is the father of my child. My uncle (appellant) never did have any illicit intercourse with me in any way. Never did ask me to. Never asked me to yield to him in any way." She also swore that she told appellant before he sent her to her father's, that she thought she was pregnant, and: "I did not tell him I would not tell who the father of the child was. I did not make him any promise in that regard."

The State impeached her on this testimony directly by her written statements in said letter. It is copied in the original opinion. It is unnecessary to again copy it. A mere reading of the letter will show

it is a direct and flat contradiction of her said testimony in favor of appellant on this trial.

That said testimony by her in favor of appellant, and given at his instance, was very material for him and against the State, can not even be questioned by anyone. Its direct and only effect, if believed by the jury, would have been to destroy the State's case and show his innocence of the crime for which he was indicted and on trial. So that it was the imperative duty of the State to discredit and impeach her as to this very material testimony, if it could do so.

Every text-book writer on the subject, and the decision of every court of the land, is, that former statements of a witness which are contradictory of his present testimony are admissible to impeach him. This is not only so by oral, but especially so by written statements. This court has always heretofore so held, and all appellate courts of this State uniformly so hold. I know of no exception. This method of impeaching a witness is daily and universally acted upon by all trial courts of this State. In order that no uncertainty might arise on this point as to one's own witness our statute (C. C. P., art. 815) expressly enacted: "The rule that a party, introducing a witness, shall not attack his testimony is so far modified as that any party, when facts stated by the witness are injurious to his cause, may attack his testimony in other manner, except by proving the bad character of the witness."

There is nothing in his bills to show, or intimate, that the State knew or had any notice whatever that Cassie Dunn would testify that Dollins was the father of her child when it introduced her and she gave material testimony in its behalf. Even if the State had known this, there is nothing in the books or decisions, until the majority opinion in this case, that the State could not impeach her by said letter and her sworn written testimony before the grand jury. The effect of the decision in Blake v. State, 38 Texas Crim. Rep., 377, cited in Judge Harper's opinion, is to the reverse of what he cites it for. The cases of Scott v. State, 20 S. W. Rep., 549; Oates v. State, 67 Texas Crim. Rep., 488, 149 S. W. Rep., 1194, and Perrett v. State, 72 Texas Crim. Rep., 212, id., 75 Texas Crim. Rep., 94, 170 S. W. Rep., 316, have no application whatever to this case. A mere reading of these several cases will clearly demonstrate what I say about them is correct.

That said letter and said statement before the grand jury was admissible to impeach Cassie Dunn, there is no shadow of doubt.

But appellant vigorously contends that the reason assigned by the trial judge why he admitted it, is, in effect, no valid reason, and is contrary to the law. His contention being, in substance, that a conspiracy can not be entered into to commit the crime of incest, arguing further that, even if there could be a conspiracy to commit such crime, that as soon as it is committed, "such conspiracy had terminated," and no statement or admission by the other party would be admissible against the party on trial.

It is elementary that a wrong reason for a correct ruling can not

affect the ruling even if it be conceded the trial judge gave a wrong reason for his correct ruling. I know of no law, or decision, to the effect that the man and woman who commit incest can not also be guilty of conspiracy to commit said crime. I know of no reason why they can not. The statute is plain that they can. Article 1433, P. C., is: "A 'conspiracy' is an agreement entered into between two or more persons to commit any one of the offenses hereafter named in this chapter." Article 1437 is: "The agreement, to come within the definition of conspiracy, must be to commit one or more of the following offenses, towit: Murder, robbery, arson, burglary, rape, or *any other offense of the grade of a felony.*" Incest is a felony. (Art. 486, P. C.)

Further, the trial judge explained and qualified appellant's bill to the admission of said letter fully. I quoted most, but not all, of this, in the third page of the original opinion, which is the first quotation therein of his quoted qualifications. He did not limit his qualification to only a conspiracy to commit the crime of incest, but pointedly stated such conspiracy went further. I will state the full substance of his explanation and qualification. It is: That a conspiracy existed between defendant and Cassie Dunn, not only to commit the crime of incest, *but also* to suppress knowledge that the child that was to be, and in fact was later, born, was the fruits of their crime of incest; *and* extended even further, to a resumption of their unlawful relations with each other as soon as the birth of the child had been accomplished and the public quieted, and their relatives satisfied regarding his connection with her, *and* that they both would deny he was the father of the child, and commit perjury with regard thereto in order to keep secret the fact that said child was the offspring of the incestuous intercourse. *and* to carry out their design that such intercourse might be resumed by them, *and it was during all this conspiracy* said letter was written to and received by him. He accepted this bill thus explained and qualified, and under the well settled rule, until now in this case, is bound thereby.

In his brief and argument he ignores,—at least does not discuss or mention,—the full conspiracy, but confines his contention to only one item of it, towit: the crime of incest. The case of Serrato v. State, 74 Texas Crim. Rep., 413, 171 S. W. Rep., 1133, is directly in point against him. In that case Serrato was on trial for the murder of Ortiz. He claimed not only that he personally had nothing to do with the killing, but also that he was not a party to any agreement or conspiracy with some fifteen others, or any of them, to kill; and, further, that, if he had entered into such conspiracy, it terminated with the killing, and that thereafter no act, conduct, word or statement by any of the others was admissible against him. The State contended that the killing did not terminate the conspiracy, but it also embraced additional things thereafter to be done. With the issues thus drawn, the State was permitted to introduce in evidence, over his objections, all the acts and conduct of each and all of said other parties, and what each of them said, after said killing and until they were actually arrested and placed

in jail—all of said acts, conducts and statements occurring after the
killing. This court expressly held all said evidence was admissible,
holding:

"It has always been the rule in this State that the acts and declara-
tions of one conspirator in furtherance of the common design are ad-
missible against another conspirator pending the conspiracy and until
its final termination. This proposition includes anything that was
within the contemplation of the conspiracy, such as dividing the spoils,
or any of those matters that may be subsequent to, but included in the
scope of the conspiracy. O'Neal v. State, 14 Texas Crim. App., 582;
Rix v. State, 33 Texas Crim. Rep., 353, 26 S. W. Rep., 505; Franks v.
State, 36 Texas Crim. Rep., 149, 35 S. W. Rep., 977; Small v. State,
40 S. W. Rep., 790; Long v. State, 55 Texas Crim. Rep., 55, 114 S. W.
Rep., 632; Gracy v. State, 57 Texas Crim. Rep., 68, 121 S. W. Rep., 706;
Milo v. State, 59 Texas Crim. Rep., 196, 127 S. W. Rep., 1028; Kipper
v. State, 45 Texas Crim. Rep., 377, 77 S. W. Rep., 611; Holt v. State,
39 Texas Crim. Rep., 282, 45 S. W. Rep., 1016, 46 S. W. Rep., 829;
Eggleston v. State, 59 Texas Crim. Rep., 542, 128 S. W. Rep., 1111.

"And what is said and done by any of the conspirators, pending the
conspiracy and in furtherance of the common design, is admissible
against the one on trial, though said and done in his absence. Wallace
v. State, 46 Texas Crim. Rep., 341, 81 S. W. Rep., 966; Barber v. State,
69 S. W. Rep., 515; Trevino v. State, 38 Texas Crim. Rep., 64, 41
S. W. Rep., 609; Dobbs v. State, 51 Texas Crim. Rep., 113, 100 S. W.
Rep., 946; Roma v. State, 55 Texas Crim. Rep., 344, 116 S. W. Rep.,
598; Cox v. State, 8 Texas Crim. App., 254, 34 Am. Rep., 746; Smith
v. State, 21 Texas Crim. App., 96, 17 S. W. Rep., 560; Armstead v.
State, 22 Texas Crim. App., 51, 2 S. W. Rep., 627; Slade v. State,
29 Texas Crim. App., 381, 16 S. W. Rep., 253; Richards v. State, 53
Texas Crim. Rep., 400, 110 S. W. Rep., 432; Bowen v. State, 47 Texas
Crim. Rep., 137, 82 S. W. Rep., 520; Williams v. State, 45 Texas Crim.
Rep., 240, 75 S. W. Rep., 509; Chapman v. State, 45 Texas Crim. Rep.,
479, 76 S. W. Rep., 477; Hannon v. State, 5 Texas Crim. App., 549;
Taylor v. State, 3 Texas Crim. App., 169; Moore v. State, 15 Texas
Crim. App., 1; Eggleston v. State, 59 Texas Crim. Rep., 542, 128
S. W. Rep., 1105." In that opinion Judge Harper cites and quotes at
length other authorities applicable herein. See also the companion cases·
of Gonzales v. State, 74 Texas Crim. Rep., 458, 171 S. W. Rep., 1146;
Gonzales v. State, 74 Texas Crim. Rep., 468, 171 S. W. Rep., 1149, and
Martinez v. State, 75 Texas Crim. Rep., 416, 171 S. W. Rep., 1153,
to the same effect.

If, as contended by appellant in his brief, the conspiracy between
him and Cassie had gone to the extent only of committing incest, then
his contention might have been applicable and sound. But the con-
spiracy between them did not stop with their agreement to commit,
and committing, incest, but, as stated by the court, it was not only
(1) to commit incest, but also (2) to suppress all knowledge that her
baby was the fruits of this crime, and (3) that they both would deny

he was the father of her child and commit perjury in order to keep secret the fact that said baby was the fruit of their incestuous sexual intercourse, and (4) as soon as the public was quieted and their relatives satisfied he was not the father of her illegitimate baby, resume their illicit incestuous intercourse. It is, therefore, certain that their conspiracy had not been completed and ended, but that it was still pending and incomplete, and they both were, on this very trial, doing all in their power and within their agreement to carry out their full conspiracy. Again, as specially applicable herein I reiterate what this court said in Martinez v. State, supra, as follows:

". . . The rules of law governing in conspiracy cases have been well established, and as said by a well-known writer:

" 'The conspiracy may, of course, be shown by direct evidence, and it is apprehended should be so proved if this character of evidence is attainable. Direct evidence. is, however, not indispensable. Circumstantial evidence is competent to prove conspiracy from the very nature of the case, and the rule which admits this class of evidence applies equally in civil and criminal cases. In the reception of circumstantial evidence great latitude must be allowed. The jury should have before them every fact which will enable them to arrive at a satisfactory conclusion. And it is no objection that the evidence covers a great many transactions and extends over a long period of time, provided, however, that the facts shown have some bearing upon, and tendency to prove, the ultimate facts at issue. But much discretion is left to the trial court, in a case depending on circumstantial evidence, and its ruling will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact. If it be shown that several have combined together for the same illegal purpose, any act done by one of them in pursuance of the original concerted plan, and with reference to the common object is, in the contemplation of the law, the act of all, and therefore proof of such act will be evidence against any of the others who were engaged in the conspiracy, and any declaration made by one of the parties in the absence of the others during the pendency of the illegal enterprise is not only evidence against himself but against all the other conspirators who, when the combination is proved, are as much responsible for such declarations and the acts to which they relate as if made and committed by themselves.' 

"These rules have been approved in all the text-books and in the following cases in our own court: Atkinson v. State, 34 Texas Crim. Rep., 424, 30 S. W. Rep., 1064; McKenzie v. State, 32 Texas Crim. Rep., 568, 25 S. W. Rep., 426, 40 Am. St. Rep., 795; McFadden v. State, 28 Texas Crim. App., 241, 14 S. W. Rep., 128; Clark v. State, 28 Texas Crim. App., 189, 12 S. W. Rep., 729, 19 Am. St. Rep., 817; Phillips v. State, 26 Texas Crim. App., 228, 9 S. W. Rep., 557, 8 Am. St. Rep., 471; Williams v. State, 24 Texas Crim. App., 17, 5 S. W. Rep., 655; Kennedy v. State, 19 Texas Crim. App., 618; Pierson v. State, 18 Texas Crim. App., 524; Avery v. State, 10 Texas Crim. App., 199; Cox v. State, 8 Texas Crim. App., 254, 34 Am. Rep., 746; and

the authorities cited in Serrato v. State, 74 Texas Crim. Rep., 413, 171 S. W. Rep., 1133, and Gonzales v. State, 74 Texas Crim. Rep., 468, 171 S. W. Rep., 1146, 1149. . . ."

Upon a most careful study of the testimony, I think it clearly supports the judge in his qualification of appellant's bill. In the original opinion I stated some of the facts. I will here give some other of the salient facts. In the first part of the original opinion I gave the material Cassie Dunn's testimony on direct examination by the State. It shows with much cogency that appellant, and he alone, had the opportunity to get her pregnant. In his brief he seems to concede this, stating that he had an opportunity, and probably the best opportunity of anyone else, to have committed the offense, "does not appear a matter of doubt under the evidence." That she was gotten pregnant by some man about January 29th, while she lived with appellant, is established with certainty by the fact that a baby was born to her October 29, 1914. She swore she told *him,* when it occurred, that she had missed her menses, but she told neither her sister nor grandmother. Se swore "that she was *sick* some way. Her womanly periods had stopped,"—the natural effect of pregnancy. They both swore he then took her to a doctor to see if she was pregnant. The doctor swore this was the latter part of February or first of March, 1914; that appellant told him to examine her, and he did so, and did not then discover any evidence of pregnancy. It was then just about a month since the act of intercourse producing pregnancy had occurred. The doctor said that he felt of her abdomen and stomach through her clothes, and did not make any further examination of her. Of course, at that early stage, his very casual examination of her could not, and would not, disclose pregnancy; but he testified that the child's birth made it certain that she was pregnant when he examined her. Appellant sent Cassie off to her father's in June, 1914. She swore that before that she told him she thought she was pregnant, but "he did not ask me who the man was," "did not make any inquiry as to who the father of it was." "He did not ask any questions about it." The reason he didn't is perfectly evident. It was because he *knew* that *he,* and no one else, had had sexual intercourse with her, and that *he,* and no one else, had gotten her pregnant, and that *he,* and no one else, could be the father of her then unborn babe. No other conclusion can be drawn. When appellant sent her off to her poor old father to be confined, he intended she should return to him as soon as the babe was born and she could, for he swore when he sent her he gave her money to buy her return ticket to come back on. She swore that she intended to return to him. The trial judge was clearly justified in believing and stating, that this return was for the purpose of resuming their illicit incestuous intercourse. That the judge was authorized to believe they both swore falsely when they said he did not have sexual intercourse with her is clear from the testimony. It was a month after she reached her father's that the doctor there; and her father, found out she was pregnant. Her father at once did all he could to get her to tell him who got her pregnant. She refused to tell.

The doctor tried to get her to tell him. She refused. The doctor then advised her that he knew a maternity home in Kansas City where she could go, be confined, the baby adopted, she return, and nobody would ever know anything about it, but it would take $250 to $300 to do this, and advised her to write to the father of the child for the money. She promptly wrote to appellant for the money, $300, telling him she wanted it to go to said maternity home in Kansas City. He failed or refused to produce that letter, but admitted he received and promptly answered it. No doubt the letter gave him full information, and if produced would have been most damaging against him. He swore, "when the girl (Cassie) wrote me she wanted $300 to go to a maternity home in Kansas City, I wrote her and asked her why she did not go to Fort Worth or Dallas or Abilene, somewhere in Texas."

The judge was clearly authorized by the evidence to believe Cassie Dunn's testimony, that Henry Dollins, and not appellant, was the father of her babe, and that she did not promise and agree with appellant not to tell he was its father, was untrue. I will give some more of these facts which justifies the judge's qualification. If Dollins, and not appellant, had been the father of her babe there was no reason on earth why she would have refused to tell on Dollins, for neither he nor she would have been guilty of any offense. When pressed for a reason she said, "because I did not want to tell it." On the other hand, there was every reason for her to refuse to tell on appellant, for, if she did, he was certain to be convicted of incest and be sent to the penitentiary as a criminal. They both knew this. She flatly refused to tell her father, her doctor, the grand jury, or anyone else. Of course appellant *knew* it without her telling him. She swore before the grand jury, "Uncle Alfred (appellant) knew when I left to go out West that I was pregnant, and I promised him not to tell it. He knows who it is." "I never had any intercourse with but one man in my life." "I had intercourse several times. I never had any sweethearts. I told Uncle Alfred not to tell who it was. He knows who it is . . . and he will not tell. I won't tell who it was." "I would not have yielded my virtue to any man that did not have my respect and confidence. I had intercourse with the man in different places, both day and night." If she had at first told her father, her doctor, and especially the grand jury, that it was Dollins, the probabilities are the grand jury would never have indicted appellant. Her late tale, that it was Dollins, is so unreasonable that it could not deceive or mislead anyone to believe it was he, and not appellant. She and Dollins were barely acquainted. They had never been thrown together so that he could have had an opportunity even to have gained her "respect and confidence." Her whole conduct and every act and word of hers, from start to finish, stamps her testimony that it was Dollins and not appellant as unreasonable. She swore she never, at any time or place, told Dollins that he was the person who got her pregnant, and never at any time so wrote him. That she never wrote to him at all. When the doctor told her to write to the father of her then unborn babe and get money to go to

the Kansas City maternity home so that she could there be confined and effectively conceal her shame, she promptly wrote to appellant, and not Dollins, for the money. She swore she loved her uncle. He swore he loved her. That love was not merely such affection as is common and natural between an uncle and niece as such, but it was more, it showed to be amorous. This record shows that the U. S. mail was kept "hot" carrying letters, almost daily, from one to the other just after he sent her away to be confined, like the most ardent lovers when separated, one from the other. Of course it was not shown the full number of letters which passed beween them. The State had no way of securing them. It is apparent they both would conceal every one which they thought would have a tendency to "give them away," and that they would produce only those which they thought would not do this. He failed and refused to produce the letter wherein she wrote for said $300, although he had to admit he received and answered it, and he denied receiving the one copied in the opinion, but the State proved not only that she wrote him that letter, but that he also received it. Among other things, her and his testimony, in effect, shows that her belated tale that Dollins, and not he, was the father of her babe, was very recently manufactured. Appellant at first had had Dollins subpoenaed as his witness to testify to his good reputation. Dollins had attended the various settings of the case to so testify for him. But just before the trial, it seems, Cassie recalled the fact that years before, and before Dollins was married, he (Dollins) had been indicted in Bosque County for seduction, and upon that, doubtless inspired by appellant, she attempted to manufacture the tale that Dollins was the man. Appellant testified that when Dollins went to work on a bridge near his house he warned Cassie not even to work in the garden in sight of, but some distance from, Dollins, "just on account of the way he (Dollins) had acted heretofore, you know. Yes, that was the reason." That his community knew Dollins had been charged with seduction. Of course both Cassie and appellant swore, in effect, there was no concert between them that she should try to swear it off on Dollins, but all the circumstances were amply sufficient to justify the belief that such was a fact. Dollins swore positively that he never at any time or place had sexual, or even ordinary social, intercourse with Cassie. And his, and other, testimony showed he never had the temptation or opportunity. That the said seduction charge against him was defeated by proving that said alleged seduced woman was common—other men had sexual intercourse with her, and all this occurred years before while he was unmarried. That he had been married for about four years, and had a strong, vigorous, healthy wife, when the offense herein charged was committed.

In his next to his last brief, appellant contended with all positiveness, in effect, that it was only "where a direct accusation of guilt is made to a defendant *in his presence* and is heard and comprehended by him, and goes undenied, that this act and fact may be shown as in the nature of an admission," and that such undenied accusation to be admissible must be "made in the *direct personal presence of the accused*,"

and that "there is no authority sustaining a rule" that his failure to answer a letter received by him so accusing him denying such accusation, is admissible. He pressed this point vigorously in argument and cited some authorities, which he claimed sustained his position.

In justice to him, it must be stated that in his last brief filed he seemed to recede from his above position, and concede, in effect, that such accusing letter unanswered denying such accusation, under certain circumstances, would be admissible as an admission of guilt, and cites authorities to that effect; but contends, that the circumstances of this case are not such as authorized said letter in evidence. At least I so understand his briefs and positions. But whether I correctly state or understand him, or not, I think, both by reason and authority, said letter, under the circumstances of this case, was clearly admissible. I will discuss the question from that standpoint.

It is the settled law of this State that when a verbal accusation of guilt is directly made to a defendant in his presence and hearing, and is understood by him, and he does not then and there deny the accusation but remains silent, said accusation and his silence are pertinent evidence against him as an admission or confession to show his guilt. This rule is established by many decisions of this court, uniformly so holding. It is unnecessary to collate them. But see LaGrone v. State, 61 Texas Crim. Rep., 170; Davis v. State, 54 Texas Crim. Rep., 236; Stanley v. State, 48 Texas Crim. Rep., 537; White v. State, 85 S. W. Rep., 1140, and sec. 223, Branch's Crim. Law, where he collates some of the cases.

The correct rule on this point is also tersely stated in an elaborate and clear note in 25 L. R. A. (N. S.), 543, where a number of cases from this and other States in point are cited, as follows: "The rule has been broadly and generally asserted that statements made in the presence of a person accused of crime, and not denied by him, must be taken as adopted by him. . . . And that they are competent evidence against him as an indication of guilt. . . ."

We understand appellant concedes the law as stated as to oral accusations. To my mind there are stronger reasons for written accusations unanswered and undenied being admissible in some instances than oral ones. But first to the authorities.

1 Greenleaf on Evidence (13th ed.), sec. 198, says: "The *possession of documents*, also, or the fact of constant access to them, sometimes affords ground for affecting parties with an implied admission of the statements contained in them. Thus, . . . the possession of letters, and the like,—are circumstances from which admissions by acquiescence may be inferred. . . ."

1 Wig. on Ev., sec. 260, says: "The possession of a document is an important and often the only circumstance to show that its possessor has by reading it become aware of its contents. . . . This use of such evidence needs, however, to be distinguished from its use for other purposes, which are frequently associated in the same litigation; for it may be used to evidence an *assent* to the document's contents, or an *admission* of their truth."

2 Jones on Ev. (1413 ed.), sec. 269, p. 493, says: "Letters *written to a party* and received by him may, under some circumstances, be read in evidence against him, but before they can be received as admissions against him, there must be some evidence besides mere possession showing *acquiescence* in their contents, as proof of some act or reply or statement."

16 Cyc., 960, says: "The general rule is that omission to answer a written communication is not evidence of the truth of the facts therein stated, and that under ordinary circumstances a party is not required to reply to a letter containing false statements of fact. There are circumstances, however, under which unanswered letters are competent evidence of admission by acquiescence in the statements therein contained; as when the party receiving a letter has *in any way invited* the same, or when there is *any ground to infer* that he has acted on the letter by partly answering or otherwise recognizing it."

2 Wh. Cr. Ev. (10th ed.), sec. 682, after saying, in effect, the mere finding of an unanswered and unacknowledged letter in one's custody, is not sufficient for its admission against him, says: "It is otherwise, however, when the party addressed *in any way invited* the sending to him of the letter; or *where there is ground to infer he acted* on the letter." It is useless to multiply authorities. They are all to the same effect.

Mr. Wigmore's recent work on Evidence is regarded by most as the best and most thorough ever written on the subject. In addition to what I have quoted from him in volume 1, he treats the subject in detail in volume 2, and more so than any other author. In section 1073, under the heads of "Writing sent to the Party, or Found in his Possession: Unanswered Letter": he treats the subject at length. He clearly lays down the propositions, and cites cases in point clearly supporting him, to the effect that a letter or document found in a party's possession accusing him of committing a certain crime unanswered or undenied is admissible against him as an admission of his guilt. He propounds the question: Is the party's *possession* of a third person's document "sufficient to justify an inference of assent to the statements contained therein?" And answers: "It is easy to imagine instances in which such an inference would be fallacious. Yet, since the party may always exculpate himself and disown the inference by proving the true reason for his retention of the document, the question remains whether the mere fact of possession ought not to suffice at the outset to make the document receivable, subject to explanations that may later be made. This question was in orthodox practice answered in the affirmative." Again he says: "The *failure to reply* to a *written communication* may sometimes suffice to permit an inference of the party's assent to the correctness of the statements made therein upon the general principle of (sec. 1071) 'silence gives consent.'" I think it unnecessary to cite and quote from the cases he cites in his notes. Suffice it to say they are from some of the greatest judges and courts, and clearly sustain him.

All the authors and judges writing on the point mention instances and give certain circumstances wherein such a letter would be inadmissible, but they are all very different from the circumstances and facts of this case; and none of them hold that under such facts and circumstances as shown in this case would the letter be inadmissible, but, on the contrary, their effect would be that such letter is admissible as an admission of appellant.

I will give only some of the facts and circumstances on this point. In doing so, it will be necessary to repeat some already stated. Cassie had been constantly and exclusively in appellant's care, custody and control since she was fifteen or sixteen years old—some three or four years. She had lived with him all these years. It was his duty to shield and protect her from harm and injury, and especially protect her in her virtue and chastity, which is the most sacred thing to every woman. Woman's virtue is the most sacred thing to every man, too. He, and he alone, had had the opportunity to have had sexual intercourse with her. Her menses did not come on at the regular time. She told *him,* but told neither her sister nor grandmother, who were both in his house at the time. He promptly took her to a doctor to see if she was pregnant, but it was too soon after the act of sexual intercourse for the doctor to ascertain by the very casual examination he gave her whether she was then pregnant or not. Appellant swore she was *sick*—her womanly periods had stopped. She told him, in effect, she was pregnant. He sent her far away in a distant county to be confined. At no time did she tell any other except *him* that she was pregnant, or even that she thought she was. It was more than a month after she reached her father's before the doctor there or her father, learned she was pregnant. She was then about six months "gone." The doctor at once advised her to go to a maternity home to be confined and effectively conceal her condition and write to the father of her babe for money to do this. She immediately wrote to appellant for the money, telling him it was to go to a maternity home. He received and answered her letter. He knew she could go to a *maternity* home for no other purpose than to be confined and dispose of her illegitimate babe. Such homes are for no other purpose. Her father and doctor tried to get her to tell who was the man who had gotten her pregnant. She peremptorily refused to tell. From the facts and circumstances then known to her father, he was certain appellant, and no other, was the man, and he at once wrote to him in language no one could misunderstand, denouncing him as her seducer and telling him he knew he was responsible for her condition, and calling on him "to come here at once," pay the expenses, etc. Immediately upon receiving this letter he first went to his friends, then "post haste" to his lawyer, with it. His lawyer at once wrote or advised an answer, which he signed and sent, denying his guilt and telling him, "I desire not to hear from *you* again." But he did hear again. In about a week her father wrote him he was not surprised at his denial, but, if he was not the man, "why was there

so much secrecy," and denouncing in unmeasured language the villain who took advantage of his child, and "when you prove to me you are not guilty (how?) by helping to bring the guilty to justice, then I am willing to walk from here there and get down on my knees at your feet and ask your forgiveness." Under the circumstances, if he had not been the guilty one, every impulse and dictate of honest manhood would have irresistibly compelled him to hasten to Cassie and her father, and not only establish at once to her father his innocence, but also help "to bring the guilty one to justice." He did neither—did absolutely nothing to ferret out, if another, and bring that other to justice. He swore he made no reply to her father's last letter and made no explanation whatever to him.

The said letter, the admission in evidence of which is under discussion, was *directly and expressly invited by* appellant, and after its receipt, was unquestionably *acted upon by him.* On November 22nd, he wrote Cassie: "Will answer your letter which came to hand a few days ago. Was glad to hear from you but sorry you had been sick." (She had been sick from confinement on October 29th.) . . . "I am the same fellow (as) when you saw me last, and I want to noe (know) now Cassie (if) you want to come home, an (and) I want to know what is the matter with you, an (and) just as soon as I get the news I will send you the money to come on, an (and) noebody never has read your letters and wont. Your Pa has rote some letters here an (and) I want to noe (know) if you are all right an (and) I want to know just what is the matter." On November 24th, immediately upon receipt of this letter, as therein invited and requested, she answered him. The reading of her answer just here, which is copied in full in the original opinion, will demonstrate that she therein in plain and unequivocal language accused him directly of the crime charged herein. It needs no comment to show this. That he then acted on what she stated therein, has been clearly shown above. From the very frequent correspondence between them, the jury was clearly justified to believe he answered her letter, and there can be no doubt that he did. So that under all the authorities her letter and his failure to answer and deny her accusation was without doubt admissible as an admission by him of his guilt.

The only other question to be considered is his attack on the court's charge about this letter. I copied this charge in the original opinion. As I have shown, this letter was unquestionably properly admitted to impeach Cassie Dunn, if for no other purpose. Its statements directly and positively charged appellant with being the father of her child and guilty of incest with her, for which he was indicted and then on trial. He swore he did not receive the letter. The other testimony was amply sufficient to show that this testimony by him was false, and that he did receive the letter. The court, however, could not himself decide that appellant's testimony was false, and that he did receive the letter, but it was imperative upon the court to submit that question to the jury,

made so by appellant himself. And it was necessary for the court to submit it on both theories—one, in case he had not received it, the other, in case he had received it. The court, in said charge, in very clear, apt and appropriate language, which could not be misunderstood, did submit both theories. The charge is copied in full in the original opinion. It is in a separate paragraph. Appellant made no objection to the first part of this charge. He objected to the last three lines of it only, beginning with the word "however." The court qualified and explained his bill presenting this question, as follows: "I desire to state that the charge in question was one given to the jury for the purpose of protecting the defendant's rights before the jury in their deliberations, in the event they should find that the letter in question was not received by him. The court did not inform the jury, as is contended by the defendant in the bill, that the letter was a criminative fact against the defendant, nor did it charge or intimate that said letter proved defendant's guilt; on the contrary, the court told the jury that it was for the jury to determine what weight they would give, if any, to said letter, calling their attention to the fact that the jury were the exclusive judges of the facts proven, of the credibility of the witnesses and of the weight to be given to their testimony. I thought the charge on the whole was a proper one on the subject in question, and it was designed and intended for the benefit of the defendant's rights and to safeguard the same before the jury."

It is undoubtedly the settled law of this State, established by a great many decisions of this court, and not questioned by any of them, as tersely and correctly stated by Mr. Branch in his Criminal Law, section 873, page 556, as follows: "Proof of contradictory statements offered by the State to impeach a witness, where the same could be used by the jury to establish any fact in the case, other than as affecting the credibility of the witness, should be limited in the charge. . . . If the State impeaches her own witness by proof of contradictory statements, and the same could be used by the jury to establish any fact in the case, other than the credibility of the witness, such proof should be limited in the charge. . . ." This doctrine is held and applied all the time by this court. Mr. Branch cites some of the cases only. A great many others could be cited but it is unnecessary. Cassie Dunn's statements in the letter could have been used by the jury to directly establish that appellant was guilty of incest with her. Hence, it was the imperative duty of the trial judge in his charge to tell the jury, as he did, that: "If you do not believe from the evidence, beyond a reasonable doubt, that defendant received said letter, you will not consider it for any purpose, except to aid you, if it does, in determining the credibility of Cassie Dunn, but may consider it for that purpose only." It thus being necessary for the court to tell the jury what they could do about considering the letter if *not* received, it became his further duty to tell them what they were authorized to do if it had been

received. The State is just as much entitled to a full and fair charge presenting all the contingencies as the defendant. So that I think it was the duty of the judge to tell the jury, as he did: "However, if said letter was received by the defendant, you will determine the weight you will give to it under the instructions given you in the last paragraph of this charge." Said last paragraph was: "You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to the testimony, but you are bound to receive the law from the court, which is herein given you, and be governed thereby." This should always be given in a felony case (sec. 789, Wh. Ann. C. C. P.) and is universally approved by this court. ·

I do not understand how anyone could seriously contend that said sentence beginning with "however," is on the weight of the evidence. It is not, and can not be even misconstrued to be. There is no intimation, directly or indirectly, by the judge of *his* opinion of the letter, nor of what weight, if any, *he* thought should be given to it by the jury. He told them the law—"*You* are the exclusive judges of the facts proved, the credibility of the witnesses and the weight to be given to the testimony." He left all to the jury and in no way intimated what *he* even thought about it. Such a charge as this has expressly been held proper by this court in Chas. H. Proctor v. State, 54 Texas Crim. Rep., 261. The charge there was: "If you find that the State has introduced any act of W. R. Proctor done by him in the absence of Chas. H. Proctor, after the commission of the homicide, then you will not consider it in finding your verdict, but ·you will wholly disregard it unless you find from the evidence beyond a reasonable doubt that Chas. H. Proctor directed said W. R. Proctor, *in which event you will consider it as legal evidence in the case against Chas. H. Proctor.*" (Italics added.) See also Morris v. State, 39 Texas Crim. Rep., 371 (375-6); Terrell v. State, 76 Texas Crim. Rep., 428, 174 S. W. Rep., 1088.

Appellant cites and relies upon Rice v. State, 49 Texas Crim. Rep., 584. I have carefully read and studied that case. In my opinion the condemned charge therein is wholly unlike the charge herein. The opinion of the court therein demonstrates that. In my opinion the motion should be overruled. I protest against the case being reversed.